[No. D035933. Fourth Dist., Div. One. Jan. 15, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
BRIAN ANTHONY MASON et al., Defendants and Appellants.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I. through IV. and VII. through X. of the Discussion.

**COUNSEL**

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant Brian Anthony Mason.

Stephen Gilbert, under appointment by the Court of Appeal, for Defendant and Appellant Thabita Salim Wilson.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Patti W. Ranger and Gary W. Brozio, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NARES, Acting P. J.**—In the portion of this opinion certified for publication, we conclude that the 25-year-to-life enhancement contained in Penal Code[1] section 12022.53, subdivision (d) (section 12022.53(d)) for intentional and personal discharge of a firearm which, during the commission of enumerated felonies, results in great bodily injury or death, was properly imposed not only as to defendant Wilson's conviction for murder, but also for a robbery and six attempted robberies on separate victims that accompanied the murder. In the published portion of this opinion we also hold that the provisions of the Determinate Sentencing Act (DSA), section 1170 et seq., do not apply to the indeterminate 25-year-to-life gun use enhancement imposed under section 12022.53(d) in this case. As we discuss in the unpublished portion of this opinion, we also instruct the trial court to modify the judgment to correct certain sentencing errors, remand the matter to allow the court to set terms on certain counts, and affirm the judgment in all other respects.

### INTRODUCTION

In an amended indictment filed in February 2000, the San Diego County District Attorney (the People) charged defendants and appellants Brian Anthony Mason (Mason) and Thabita Salim Wilson (Wilson) under section 187, subdivision (a) with the first degree murder of Henry Mabry (Mabry), with the special circumstances under section 190.2, subdivision (a)(17) that the murder was committed during the commission of a robbery and burglary (count 1). In conjunction with count 1, the People also alleged as an enhancement under section 12022.53, subdivisions (d) and (e) that Mason

---

[1]All further statutory references are to the Penal Code unless otherwise specified.

and Wilson intentionally and personally discharged a firearm causing serious bodily injury or death. Mason and Wilson were also charged under sections 213, subdivision (b), and 664 with the attempted robbery of Mabry (count 2). They were charged under sections 459 and 460 with residential burglary (count 3). In conjunction with count 3, Wilson was charged under section 12022.5, subdivision (a)(1) with personal use of a firearm, and Mason was charged under section 12022, subdivision (a)(1) with a vicarious arming allegation. The People charged Mason and Wilson under section 211 with the robbery of Randy Williams (Randy W.) (count 4), and under sections 213, subdivision (b), and 664 with the attempted robbery of Ronnie Williams (Ronnie W.), Lareka Davis (Lareka D.), David Gause (David G.), Damien Gee (Damien G.) and Brandy Ellis (Brandy E.) (counts 5-9). In conjunction with counts 5 through 9, Wilson was charged with enhancements under section 12022.53, subdivisions (b), (c) and (d) for (1) personally using a firearm, (2) intentionally and personally discharging a firearm, and (3) intentionally and personally discharging a firearm and causing serious bodily injury or death. Mason was charged with the same three enhancements as a principal. Additionally, all charges were alleged, under section 186.22, subdivision (b)(1), to have been committed with the specific intent to promote, further or assist criminal conduct by gang members.

Mason and Wilson were tried together, after the court denied their motions to sever their trials. In April, the jury convicted them of all offenses and found true all allegations.

In June 2000, the court sentenced Mason on count 1 to life in prison without the possibility of parole, plus 25 years to life for the firearm enhancement. The court stayed the sentence on the remaining counts and allegations.

In July 2000, the court sentenced Wilson on count 1 to life in prison without the possibility of parole, plus a three-year upper term for the gang enhancement and 25 years to life for the firearm enhancement. On count 4, the court imposed a determinate eight-year upper term for robbery, plus a three-year upper term for the gang enhancement and 25 years to life for the firearm enhancement. On the five counts of attempted robbery (counts 2, 5-9), the court sentenced Wilson to a consecutive determinate term of eight months for the substantive offenses, a consecutive eight-month term for the gang allegations, and 25 years to life for each firearm enhancement.

In June 2000 Mason appealed from the judgment and in August 2000 Wilson appealed from the judgment.

On appeal, Mason contends that (1) the court should have granted his motion to sever his trial from Wilson's; (2) the evidence is insufficient to

establish the homicide occurred during the commission of a robbery; and (3) there is insufficient evidence to support a finding of attempted robbery on counts 5 through 9. Mason also asserts that the court erred in his sentencing as (1) the sentence violates state and federal constitutional prohibitions on cruel and unusual punishment; (2) imposition of a 25-year-to-life sentence for gun use violates state and federal equal protection principles; and (3) the abstract of judgment must be corrected to reflect that no terms were imposed on counts 5 through 9, which were stayed by the court. Mason also joins the arguments made by Wilson to the extent they benefit him.

Wilson, like Mason, asserts that (1) there is insufficient evidence to support the jury's finding that the homicide occurred during the commission of a robbery, and (2) there is insufficient evidence to support the attempted robbery convictions on counts 5 through 9. Additionally, Wilson contends the court's sentence was improper as (1) the court imposed the upper term for first degree robbery when the verdict was for second degree robbery; (2) the court imposed consecutive sentences for attempted first degree robbery on counts 5 through 9 when the verdict was for second degree robbery; (3) the court improperly imposed seven consecutive 25-year-to-life firearm enhancements on the attempted robbery counts; (4) the court should not have imposed full terms on the seven consecutive 25-year-to-life enhancements; and (5) the court could not add a term of years to the life sentence on count 1. Wilson also joins in all of Mason's assertions on appeal to the extent they benefit him.

The People agree that Wilson's sentence on count 4 must be reduced to reflect his conviction for second degree robbery, but argue that his sentences for attempted first degree robbery on counts 5 through 9 must stand. The People also agree that Wilson's three-year consecutive sentence for the gang enhancement on count 1 must be stricken. The People further agree with Mason that his abstract of judgment should be amended to reflect the actual sentence rendered by the court.

We affirm the judgment, with the exception that (1) the abstract of judgment is modified (a) to reflect a sentence of five years against Wilson on the count 4 second degree robbery conviction, (b) to reflect sentences of six months against Wilson on the counts 5 through 9 second degree attempted robbery convictions, and (c) to reflect that the three-year gang enhancement on the count 1 murder conviction against Wilson is stricken; and (2) the matter is remanded for the court to set terms and stay them on counts 2, 3 and 5 through 9 as to Mason.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *People's Case*

On July 6, 1999, Mabry was renting room 118 at the Colony Inn motel in National City, California (the motel). That evening, Mabry had a party in his room with Ronnie W., Ronnie W.'s brother Randy W., Damien G., David G., Lareka D., Brandy E. and Audrenia Sams (Audrenia S.). Mabry was a Crip-set gang member with the nickname "Big Homey." Ronnie W. and Randy W. were also Crip-set gang members.

At approximately 8:00 p.m., Audrenia S. called some male friends over to the motel. The three men, Mason, Wilson, and Wilson's brother Thandiwe Wilson (Thandiwe W.), who were associated with a rival Blood-set gang known as Lincoln Park, arrived at approximately 8:30 p.m. After drinking alcohol, smoking marijuana, swimming in the motel pool and watching movies, the group returned to Mabry's room.

When they returned, they began rapping. Wilson and his brother Thandiwe W. were using lyrics that were insulting to Crips, including describing Crips as "crabs." The lyrics insulted Mabry, who was very drunk. Mabry responded with his own derogatory comments, using such words as "cuz" and "slob" to describe Bloods. The insults resulted in an argument, and eventually Mabry kicked Mason, Wilson and Thandiwe W. out of his room. Mason, Wilson and Thandiwe W. left, taking Audrenia S. with them.

After they left, according to Audrenia S., Mason attempted to calm Wilson, and told Wilson that it was not a big deal. Audrenia S. believed that Wilson had calmed down. Mason drove Audrenia S. to a trolley station. They told her they were going home.

Mabry, Ronnie W., Randy W., Damien G., David G., Lareka D., and Brandy E. remained in Mabry's room. Mabry was asleep on the bed. David G. and Lareka D. were "having relations" on the floor by the closet area.

Shortly after midnight, Mason, Wilson and Thandiwe W. returned to the motel room.[2] In order to gain entry, they said they had left something behind. Once inside, one of them locked the door. Wilson pulled out a .380-caliber semiautomatic handgun and told the people in Mabry's room to get on the floor. The victims were commanded to "break bread" (turn over their valuables). Thandiwe W. grabbed Mabry's duffel bag and threw it

---

[2]There was some discrepancy in the testimony of witnesses as to whether only the three returned or whether a fourth person joined them.

towards the door. One of the intruders tried to grab Ronnie W.'s necklace, but it would not come off.

Mabry appeared to be their primary target. Wilson commanded his companions to "wake his crab ass up." Mason and Wilson then began hitting and kicking Mabry while yelling "Lincoln Park" or "Lincoln Park Murder Gang." At Wilson's command, Mason stripped Mabry of his gold chain. Someone struck Mabry with a chair. Wilson hit Mabry on the head with the gun. Ronnie W. attempted to help Mabry and hit one of the assailants. Mason turned around and hit Ronnie W., causing him to fall to the floor. At the end of the assault, Wilson shot Mabry execution-style near the right temple, and the intruders fled.

Police arrived shortly after the shooting, having received a report of shots being fired. They found Mabry slumped over the bed, fatally shot. The police detained and interviewed the witnesses that were present in Mabry's room.

From the motel room, police recovered a portion of Mabry's necklace, two shell casings and one bullet fragment. A second bullet fragment was recovered from Mabry's head during an autopsy. A forensic analysis revealed that both bullets were most likely fired from the same .380-caliber semiautomatic weapon.

Mabry died as a result of a single gunshot wound to the head that entered in front of his right ear. The shot was fired from close range, less than three inches away. Mabry's blood alcohol was .27 at the time of death, a level consistent with his having consumed approximately 22 beers.

As a result of their interviews with witnesses, police obtained a description of the car in which the assailants left. The description sounded similar to a vehicle driven by Mason that one officer had stopped a week earlier. The following evening, police conducted surveillance of the 5000 block of Bunnell Street, looking for the subject vehicle. Within 20 minutes, the vehicle was spotted. Police stopped the vehicle, which was driven by Mason, and in which Wilson was a passenger. Mason and Wilson were arrested. Analysis of Mason's automobile revealed traces of gunshot residue in the front and back seats.

National City police detectives interrogated Mason that evening. He said that on the evening of the shooting he drove to Mabry's motel room in National City. While there, he smoked marijuana, drank alcohol, watched television and swam. Mason stated that he stayed about two hours and left

between 10:30 and 11:00 p.m. He left because the party was over and he received a page from his girlfriend. He left and went to see his girlfriend, April Van Dyke (Van Dyke), in Emerald Hills. Mason and Van Dyke then went to Qualcomm stadium to pick up a girl named Malale Johnson (Johnson). After that, they drove to Johnson's house, where Mason talked to Van Dyke and Johnson for a few minutes. He then drove home, arriving before midnight. His mother was asleep when he arrived.

When interviewed, Van Dyke originally told detectives that Mason picked her up around 9:00 p.m. the night of the shooting. She said she and Mason then picked up her friend, Johnson, and returned home about 11:00 p.m. Mason left about 11:30 p.m. However, Van Dyke eventually admitted that she had not seen Mason that day. She said that she did receive a call from him between 9:00 and 10:00 p.m. the evening of the shooting from a motel party with noises from numerous people in the background. Van Dyke stated that Mason then called her again after midnight and told her to say that he was at her house.

Police interviewed Wilson separately the evening of his arrest. Wilson stated that he and his brother Thandiwe W. went to a party at a motel in National City at approximately 8:00 p.m. the night of the shooting. He could not recall the name of the motel, but he thought the room number was 118 or 119. They stayed at the motel until about 11:00 p.m. The group swam in the pool, used the Jacuzzi, watched movies and drank beer. There were no arguments at the party. When he and his brother left, the "big guy" whose room they had visited sounded hostile. However, Wilson denied calling him a "crab" and denied that the man called him a "slob." After leaving the motel, he and his brother drove around for a while and then went home.

In the days following the shooting, police searched the bedroom shared by Wilson and his brother Thandiwe W. They seized a shirt and had it tested. The shirt tested positive for gunshot residue. Investigators also seized papers containing incriminating rap lyrics. They also found a piece of paper identifying Mabry's motel room that also had the words "Lincoln Park" on it. Telephone records for Mabry's motel room showed two phone calls to the Wilson residence the night of the shooting.

Police gang experts testified that Mason and Wilson were members of the Lincoln Park street gang, as was Wilson's brother Thandiwe W. Mason had the gang moniker "Tiny Lon Don." Lincoln Park is a "Blood set," associated with the Bloods gang. The Bloods and Crips are rivals and usually do not get along. Activities of the Lincoln Park gang include murder, robbery and assault. In the expert's opinion, the charged crimes were gang crimes in that

they were committed for the benefit of, at the direction of, and in association with gang members.

### B. *Defense Case*

Neither Mason nor Wilson testified on his own behalf. Mason's defense consisted of three character witnesses, his father, his mother, and a minister, who testified that Mason was a peaceful person and not aggressive. Wilson presented an alibi defense. Wilson's mother and sister testified that on the night of Mabry's murder Wilson returned home before the time the crimes were committed.

### C. *Defense Motion to Sever*

Prior to trial, Wilson and Mason made motions to sever their trials. The motions were brought on the grounds that Wilson's and Mason's defenses were incompatible; and Mason could not be adequately insulated from gang evidence admitted against Wilson. Counsel for Mason argued in an in camera proceeding that his client was prepared to testify that he was present along with Wilson at the crime, but did not participate. Wilson's defense, on the other hand, was that he was not at the scene of the crime. The court denied the motions.

Thereafter, at the close of the People's case, Mason moved for a mistrial and renewed his request for a severance. Counsel for Mason informed the court that he had intended to call Mason to testify. However, Mason had informed counsel that he could not testify because he was housed in jail with gang members who would kill him in retaliation if he testified truthfully that he and Wilson were present at the shooting.

Counsel indicated that Mason's testimony would provide him a complete defense. Mason would testify that when he, Wilson and Thandiwe W. returned to Mabry's room, Mason remained outside. The fight had already commenced when he reached the motel room. Mason was not aware that anyone had a gun. Mason had no intention to hurt, rob or kill anyone. Mason ran from the room when the first shot was fired.

Counsel stated that Mason's fear for his life prevented him from testifying at a joint trial with Wilson. Counsel argued that the court's refusal to sever their trials thus denied him due process of law.

The court denied Mason's motion. The court found that Mason was actively involved in the crime and as a getaway driver. The court further

found that since Mason was in a gang, he faced the choice of not saying anything to protect the gang or presenting his testimony. The court offered to house Mason separately, to put him in isolation, or seek out-of-state custody arrangements if he chose to testify. The court also found that separate trials would place an undue burden on the court and witnesses who were also under extreme pressure and intimidation. The court also noted that if Mason testified in a separate trial, there would still be the danger of retribution. Regarding Mason's fear of testifying, the court noted that "if you want to live the life of a gangbanger and you get caught in the act, this is what it leads to. That's a hard decision he's got to make."

DISCUSSION

I.-IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

V. *Imposition of the 25-year-to-life Enhancements for Infliction of Great Bodily Injury or Death*

The court imposed a total of seven separate 25-year-to-life enhancements against Wilson on the murder, robbery and attempted robbery convictions in counts 1, and 4 through 9, pursuant to section 12022.53(d), which provides that: "[A]ny person who is convicted of a felony specified in subdivision (a), Section 246, or subdivision (c) or (d) of Section 12034, and who *in the commission of that felony* intentionally and personally discharged a firearm and proximately caused great bodily injury . . . or death, *to any person other than an accomplice*, shall be punished by a term of imprisonment of 25 years to life in the state prison, which shall be imposed in addition and consecutive to the punishment prescribed for that felony." (Italics added.)

The felonies "specified in subdivision (a)" include murder, robbery and attempted robbery. (§ 12022.53, subd. (a)(1), (4) & (18).)

 The question presented here, one of first impression, is whether section 12022.53(d) may properly be imposed only as to the murder count (count 1) because that victim (Mabry) is the only one who suffered great bodily injury or death or, as the court found, also on the robbery and attempted robbery counts (counts 4 through 9) because the shooting of Mabry occurred "in the commission of" those felonies. Wilson's assertion

*See footnote, *ante*, page 1.

that a section 12022.53(d) enhancement should only apply where the victim of a qualifying felony is the person injured or killed is intuitively appealing. However, reading the plain language of section 12022.53 and recognizing the purpose for which it was enacted, we conclude that the court properly imposed 25-year-to-life enhancements on counts 4 through 9, even though the victims of those crimes did not themselves suffer great bodily injury or death.

■ "The court's role in construing a statute is to 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] '[I]t is the language of the statute itself that has success-fully braved the legislative gauntlet.' [Citation.] [¶] When looking to the words of the statute, a court gives the language its usual, ordinary meaning. [Citations.] If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs. [Citations.]" (*People v. Snook* (1997) 16 Cal.4th 1210, 1215 [69 Cal.Rptr.2d 615, 947 P.2d 808].)

■ The use of the words "any person" to describe against whom the great bodily injury or death must be inflicted, as opposed to "that person" or "the victim," demonstrates that the court's interpretation was correct. The word "any" is an adjective that means "one, a, an, or some; one or more without specification or identification." (Random House Unabridged Dict. (2d ed. 1993) p. 96.) Thus, the phrase "any person" describes not just the victim of one of the enumerated felonies, but *any* other person, so long as that person suffered great bodily injury or death "in the commission of" the felony. By contrast, if the Legislature had intended to limit the enhance-ment's reach to only an enumerated felony where only the *victim* of that felony suffered great bodily injury or death, it would have used a limiting phrase such as "that person." "That" is "used to indicate a person, thing, idea, state, event, time, remark, etc., as pointed out or present, mentioned before, supposed to be understood, or by way of emphasis." (Random House Unabridged Dict., *supra*, at p. 1965.) Even simpler, the Legislature could have simply used the phrase "the victim" which would have clearly limited section 12022.53(d)'s operation as Wilson suggests.

Additional support for this reading of section 12022.53 comes from subdivision (f) of the statute, which provides in part, "Only one additional term of imprisonment under this section shall be imposed *per person for each crime.*" (Italics added.) Hence, the Legislature, in limiting the number of enhancements that are to be imposed, could have, but did not, limit imposition to one enhancement per discharge of a firearm or per infliction of

great bodily injury or death. Rather, the only limitation is that only one enhancement may be imposed per *crime* (i.e., qualifying felony).

Further, in enacting section 12022.53, the Legislature expressly declared its intent: "The Legislature finds and declares that substantially longer prison sentences must be imposed on felons who use firearms in the commission of their crimes, in order to protect our citizens and to deter violent crime." (Stats. 1997, ch. 503, § 1.) ■ Firearm offenses are treated "more harshly than the same crimes committed by other means, in order to deter the use of firearms and save lives." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 497-498 [90 Cal.Rptr.2d 517].) "A firearm can inflict deadly wounds on a number of people within a wide area and within a short amount of time . . . ." (*People v. Morgan* (1973) 36 Cal.App.3d 444, 449 [111 Cal.Rptr. 548].)

■ Thus, the policy behind a sentence enhancement for firearm use in the commission of a felony that results in great bodily injury or death supports imposition of sentence enhancements for each of the robbery and attempted robbery counts. The use of a firearm and shooting of Mabry increased the risk of harm to all the victims, whether from an errant bullet or the turmoil following the shooting. It also increased the other victims' fear, having witnessed Mabry being shot at point blank range to the head and thinking that they might be next. Even though the victims of the attempted robberies were not themselves injured or killed, the shooting of Mabry increased the harm and danger to each one of them, thus justifying imposition of the section 12022.53(d) sentence enhancement as to each of the robbery and attempted robbery counts.

Further, although there are no California reported decisions addressing the precise issue presented here, case law interpreting the firearm use enhancement contained in section 12022.5[7] supports this broad reading of section 12022.53(d). For example, in *People v. King* (1993) 5 Cal.4th 59 [19 Cal.Rptr.2d 233, 851 P.2d 27] (*King*), in which the defendant shot two victims in rapid succession during a robbery, the California Supreme Court addressed the issue of whether more than one firearm use enhancement could be imposed under section 12022.5 where two victims are injured on one occasion. Reversing its previous position stated in *In re Culbreth* (1976)

---

[7]Section 12022.5, subdivision (a)(1) provides in part: "[A]ny person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for 3, 4, or 10 years."

17 Cal.3d 330 [130 Cal.Rptr. 719, 551 P.2d 23] that only one firearm use enhancement could be imposed "per occasion," the high court first noted that nothing in the language of section 12022.5 imposed such a limitation on the firearm enhancement. (*King, supra,* 5 Cal.4th at p. 72.) The court also cited several Court of Appeal decisions criticizing the *Culbreth* rule and its illogical result of restricting trial courts to one firearm-use enhancement where a defendant victimizes several persons at once, while permitting multiple enhancements where a defendant victimizes the same number of persons but on different occasions. (*Id.* at pp. 72-75.) The court quoted with approval one appellate court opinion giving an example of the unjust results of limiting firearm use enhancements to one "per occasion": " 'An armed defendant convicted of robbing seven solitary attendants at seven gas stations on the same street on the same evening may receive seven consecutive sentences and seven consecutive gun use enhancements. . . . But the armed outlaw who robs a group of seven individuals at one gas station may receive seven consecutive robbery sentences and only one firearm use enhancement. On what basis is a more lenient sentence for the [latter] felon justifiable? Are the "extra" six victims any less terrorized because they were, from the outset, part of a group? Are one felon's criminal actions less blameworthy than those of the others? [¶] . . . [T]his is just another way of saying that the more grandiose the perpetrator's original plan, in terms of the number of victims, the less severe will be the punishment—a grotesque rule of law by any standard.' " (*Id.* at pp. 73-74.)

Similarly, in *In re Tameka C.* (2000) 22 Cal.4th 190 [91 Cal.Rptr.2d 730, 990 P.2d 603] (*Tameka C.*), a juvenile proceeding in which a minor was charged with having committed multiple assaults with a firearm, the trial court added two firearm use enhancements under section 12022.5 to sentences imposed for an assault on a peace officer at whom the minor fired and a child who was struck in the eye by a glass shard when the minor's shot went astray and went through the glass door of a hotel. (*Tameka C.*, at pp. 191-193.) The high court upheld imposition of multiple gun use enhancements, even though only one bullet was fired, stating: "The language of section 12022.5, subdivision (a), and the intent of the Legislature in enacting this provision support the conclusion that an enhancement for each assault is appropriate in the present case. The intent of the enhancement provision is to ' "deter persons from creating a potential for death or injury resulting from the very presence of a firearm at the scene of the crime" ' [citation], and to ' "deter the use of firearms in the commission of violent crimes by prescribing additional punishment for each use." ' [Citation.] . . . '[T]he term "use," as employed in this statute [section 12022.5] should be broadly construed, consistent with common usage, to check the magnified risk of serious injury which accompanies any deployment of a gun in a criminal endeavor.'

[Citation.] It is clear that one who engages in an urban gun battle is more culpable than one who fires a weapon at an isolated individual. The risk of injury to bystanders clearly is a risk arising from even one firing of the weapon. The more culpable and dangerous the behavior, the greater need exists for effective deterrence. An increased sentence measured by the risk of harm to multiple victims reflects a rational effort to deter such reprehensible behavior." (*Tameka C., supra,* 22 Cal.4th at p. 196.)

Similarly in this case, the intent of the section 12022.53(d) enhancement to deter the use of firearms in crimes, and the increased risk presented by a shooting in a motel room filled with people, not just to the person shot but to the other robbery victims, supports the multiple enhancements imposed in this case. A person who holds up a group of people with a firearm, robs or attempts to rob them all, and shoots and kills one *is* more culpable than an individual who robs and shoots a single individual. In sum, based upon the clear language of section 12022.53(d), its purpose of deterring crimes committed with firearms, and the heightened danger and culpability of the multiple crimes committed here with a firearm, the court did not err in imposing section 12022.53(d) enhancements against Wilson on counts 4 through 9.

## VI. *Imposition of Full Strength Enhancements on the Attempted Robbery Counts*

In addition to asserting that the court improperly applied section 12022.53(d) enhancements to the attempted robbery counts, Wilson also contends that if the enhancements were proper, the court erred in imposing full terms for those enhancements. We reject this contention.

Under the DSA, section 1170 et seq., "if a defendant is convicted of more than one offense carrying a determinate term, and the trial court imposes consecutive sentences, the term with the longest sentence is the 'principal term'; any term consecutive to the principal term is a 'subordinate term.'" (*People v. Felix* (2000) 22 Cal.4th 651, 655 [94 Cal.Rptr.2d 54, 995 P.2d 186] (*Felix*).) Section 1170.1, subdivision (a) provides in part that the subordinate term for each such consecutive felony "shall consist of one-third of the middle term . . . , and shall include one-third of the term imposed for any specific enhancements applicable for those subordinate offenses."

Based upon these provisions Wilson argues that since the robbery and attempted robbery counts were "subordinate terms" with determinate sentences, the court could not impose section 12022.53 enhancements of 25

years to life on those counts, but only one-third of the term imposed for those counts.

However, the DSA only involves determinate sentences and "does not 'affect any provision of law that . . . expressly provides for imprisonment in the state prison for life' . . . ." (*Felix, supra,* 22 Cal.4th at p. 659.) Thus, the DSA sentencing scheme only applies when *all* the terms of imprisonment are "determinate," i.e., of specified duration. (*People v. Reyes* (1989) 212 Cal.App.3d 852, 856 [260 Cal.Rptr. 846].) Where there are both determinate and indeterminate sentences, the provisions of the DSA, and more particularly section 1170.1, do not apply. (*Ibid.*; Advisory Com. com., 23 pt. 2 West's Ann. Codes, Rules (1996 ed.) foll. rule 451, p. 73 ["The provisions of section 1170.1[, subdivision] (a) limiting consecutive terms to a 'subordinate term' consisting of one-third of the middle term for the additional crimes . . . can . . . be applied only when all the sentences were imposed under section 1170."].)

Here, all sentences were not determinate. The sentence enhancements for use of a firearm causing great bodily injury or death were 25-year-to-life, *indeterminate* sentences. Further, these indeterminate enhancements cannot exist independently of the robbery and attempted robbery counts to which they were appended. (*People v. Lyons* (1999) 72 Cal.App.4th 1224, 1228-1229 [115 Cal.Rptr.2d 259].) Thus, as the gun use enhancements of section 12022.53 are indeterminate sentences, the terms of section 1170.1 do not apply. Indeed, it would be impossible to impose one-third of a sentence of 25 years to life, as there is no number from which to calculate the one-third sentence. The court did not err in imposing full 25-year-to-life enhancements on the robbery and attempted robbery convictions.

VII.-X.*

. . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The court is instructed to modify the judgment (1) to reflect a sentence of five years against Wilson on the count 4 second degree robbery conviction; (2) to reflect sentences of six months against Wilson on the counts 5 through 9 second degree attempted robbery convictions; and (3) to reflect that the three-year gang enhancement on the count 1 murder conviction against Wilson is stricken. This matter is remanded for the court to set terms and stay them on counts 2, 3 and 5 through 9 as to Mason. The clerk of the

*See footnote, *ante,* page 1.

superior court is ordered to correct the abstract of judgment and to forward a corrected copy to the Department of Corrections. In all other respects the judgment is affirmed.

Haller, J., and McIntyre, J., concurred.

On January 16, 2002, and February 13, 2002, the opinion was modified to read as printed above. Appellants' petitions for review by the Supreme Court were denied May 1, 2002. Kennard, J., was of the opinion that the petitions should be granted.