[No. B170957. Second Dist., Div. Eight. Dec. 9, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
EARL COBB, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to *California Rules of Court,* rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1, 2, 4, and 5 of Discussion.

**COUNSEL**

Raymond L. Girard, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Linda C. Johnson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RUBIN, Acting P. J.**—Defendant and appellant Earl Cobb appeals from the judgment entered following a jury trial that resulted in his conviction of first degree murder.[1] He contends: (1) he was denied due process as the result of an unduly suggestive pretrial identification procedure; (2) there was insufficient evidence that defendant was the direct perpetrator and no aiding and abetting instruction was given; (3) multiple enhancements under section 12022.53 subdivisions (d) and (e)(1) were barred by sections 654 and 12022.53, subdivision (f); (4) the sentence imposed constitutes cruel and unusual punishment; and (5) he was denied due process because the reasonable doubt instruction given was inadequate. We modify the judgment and affirm it as so modified.

### FACTUAL AND PROCEDURAL BACKGROUND

Viewed in accordance with the usual rules on appeal (*People v. Kraft* (2000) 23 Cal.4th 978, 1053 [99 Cal.Rptr.2d 1, 5 P.3d 68] (*Kraft*)), the evidence established that East Arbor Vitae Street in Inglewood is in an area claimed by the criminal street gang known as the Raymond Avenue/Osage Legend Crips (the Crips). The criminal street gang known as the Queen Street Bloods (the Bloods), of which defendant was a member, claimed an area just north of that claimed by the Crips. On January 17, 2002, the Crips and the Bloods were "at war."

At 7:00 p.m. that day, Detective Kerry Tripp was investigating the shooting of Blood gang member Colbert Huff, which had just occurred at Inglewood Avenue and Queen Street. Defendant, wearing a black T-shirt over a red

---

[1] Defendant was charged by information with the first degree murder of Shawn Quash. (Pen. Code, § 187, subd. (a); all further undesignated section references are to the Penal Code). Both personal firearm use enhancements and firearm use by a principal enhancements were alleged pursuant to section 12022.53, subdivisions (b), (c), (d) and (e)(1). It was further alleged that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)). The jury found true each of the section 12022.53 enhancements, as well as the section 186.22 enhancement. Defendant was sentenced to 75 years to life in prison, comprised of 25 years to life for the murder, plus consecutive 25-year enhancements pursuant to section 12022.53, subdivision (d) (personal firearm use causing great bodily injury or death) and section 12022.53, subdivisions (d) and (e)(1) (a principal used a firearm causing great bodily injury or death).

T-shirt, was one of the people gathered at the scene.[2] He appeared particularly upset, crying and asking whether Huff would live. Also present at the scene was Huff's wife, Maria Jeffrey. Huff's killer was never identified.

At about 8:00 p.m., Jacqueline Mendez was walking home on Arbor Vitae Street when she noticed three men standing directly under a street light at the corner of Arbor Vitae and Osage Streets. Believing the men were "up to no good," Mendez took out a can of Mace and watched them as she walked. Across the street from these three men, Mendez saw her neighbor, Barbara Turner, walking with Turner's boyfriend, Shawn Quash. Mendez watched as the three men walked into the middle of the street and exchanged words and hand gestures with Quash; then all three pulled out guns and fired multiple times at Quash.[3] When the shooting started, Mendez hid behind a parked truck. She heard about 15 shots fired before the three men ran past her to a car parked on Osage Street, got in and drove away.[4] Mendez, who only saw the three assailants from the side, described them to the police as "tall" and wearing dark gray clothes, but was unable to provide a more detailed description. She did not identify anyone from the photographic lineups shown to her by the police, and could not identify defendant in court.

Turner was standing with Quash on Osage Street when she saw three men approach. Because he was in the middle and shorter and thinner than his companions, Turner's attention focused on defendant, who was wearing a red T-shirt underneath a black T-shirt.[5] One of the three men, Turner could not recall which, said, "What's up dawg? Don't you remember us?" When Quash

---

[2] Members of the Bloods typically wore multiple T-shirts layered over one another, one of which was usually red.

[3] An autopsy revealed that Quash suffered seven gunshot wounds, two of which were fatal. Several bullet fragments were recovered from Quash's body. Nineteen cartridge casings were discovered at the scene, but were not tested for fingerprints. Of those 19 cartridges, 13 were 9-millimeter caliber and six were .380-caliber. The six .380-caliber cartridges were of two different makes: one was stamped G.F.L. and the other five were stamped Winchester. The firearms used in the shooting were never recovered, but tests on the casings and bullet fragments established that two guns had been used in the shooting: a 9-millimeter and a .380-caliber. Bullet fragments in Quash's body came from both types of firearms, although the type of weapon(s) that caused the fatal head wounds could not be determined. In a search of defendant's home following his arrest, two .380-caliber cartridges stamped G.F.L. were found.

[4] As the three men ran toward their getaway car, one of them slipped. Mendez saw this man touch the floor to right himself, but did not notice whether or not he touched any of the nearby parked cars. Defendant's palm print was lifted from the hood of a Toyota Camry which had been parked behind the getaway car. There was no way to determine how long defendant's palm print had been there, but the Toyota was very dusty and there was no dust on the palm print. When the owner of the Toyota parked it there at about 7:15 p.m., he did not notice the palm print.

[5] In a search of defendant's home after his arrest, police found a red and a black T-shirt, both inside out, as though they had been recently taken off.

started to run, defendant said, "This is Bloods," and pulled out a gun. The man on defendant's right also pulled out a gun and both started shooting at Quash. As soon as she saw the guns, Turner ran and hid behind a trash can. She heard between 12 and 13 shots fired. When she returned to the street after the shooting had stopped, the three men were gone. Tripp opined that Quash was shot in retaliation for the Huff shooting.

The day after the shooting, Turner showed Detective Stephen Seyler a photograph of Paul Cole which she had torn from a high school yearbook, and told him that she thought Cole might have been the shooter in the middle. The next day, Seyler compiled two photographic lineups. The first contained six pictures, including defendant's in position No. 1 and Cole's in position No. 5 (the 6-pack). The second contained 16 pictures, including defendant's in position No. 9 (the 16-pack). After first tentatively identifying Cole as the shooter in the middle, Turner changed her mind and positively identified defendant. She also positively identified defendant in court.

In defense, Maria Jeffrey testified that after she learned her husband, Huff, had been shot at about 7:00 p.m., she went to the scene of the shooting. There, she encountered defendant, whom she had never before met. A friend drove Jeffrey, defendant and another friend to Martin Luther King Hospital, where they arrived at some time between 7:45 and 8:00 p.m. and went directly to the trauma waiting room. Shortly before 8:00 p.m., defendant left the trauma waiting room. When Jeffrey left the waiting room at about 8:00 p.m. to greet Huff's parents, she saw defendant sitting in the general waiting room. Jeffrey returned to the trauma waiting room, followed by defendant a few minutes later. At about 9:00 p.m., Jeffrey saw defendant standing outside with Huff's mother. That night, Jeffrey left the waiting room a number of times. Six or seven of those times, Jeffrey saw defendant in the hospital. Jeffrey particularly noticed defendant because his appearance—big, long-sleeved red T-shirt and big afro—stood out. When Jeffrey left the hospital at 3:00 a.m., defendant was still there.

At 7:00 p.m. that night, Huff's mother, Eilene, received a call from Jeffrey, informing her that Huff had been shot. When Eilene arrived at the hospital at 8:10 p.m., she met Jeffrey near the trauma waiting room. During the ensuing evening, Eilene noticed defendant in the waiting room. Shortly before 9:00 p.m., defendant left the waiting room. When Eilene went outside a few minutes before 9:00 p.m. to use her cell phone, she saw defendant standing outside. Eilene also saw defendant when she went outside to make another call at 10:26 p.m. Eilene saw defendant at the hospital several times that night.

## DISCUSSION

1., 2.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3. *Multiple Section 12022.53 Enhancements*

For the first time on appeal, defendant contends the trial court erred in imposing one 25-year enhancement pursuant to section 12022.53, subdivision (d) for defendant's *personal* use of a firearm causing great bodily injury or death, and a second 25-year enhancement pursuant to section 12022.53, subdivisions (d) and (e)(1) for defendant's *vicarious* liability for a principal's use of a firearm causing great bodily injury or death. He argues that the imposition of both enhancements violates the section 12022.53, subdivision (f) (section 12022.53(f)) proscription against multiple enhancements, as well as section 654. The People counter that the subdivision (f) proscription should not apply to a "group shooting" where two crimes were committed: one by the defendant and one by the accomplice(s).[10] The People analogize such a "group shooting" to the multiple victim situation, which the court in *People v. Oates* (2004) 32 Cal.4th 1048, 1066 [12 Cal.Rptr.3d 325, 88 P.3d 56] (*Oates*), found was not subject to the section 12022.53(f) proscription against multiple enhancements.[11] We conclude that the analogy is inapt and no "group shooting" exception is warranted in this context where there was only one victim.

█ Section 12022.53 prescribes substantial sentence enhancements for using a firearm in the commission of certain listed felonies, including murder. Three subdivisions of section 12022.53 are germane to our analysis. █ Subdivision (d) of the statute provides for an additional consecutive 25-year-to-life prison term for any person convicted of murder "who, in the

---

*See footnote, *ante*, page 1051.

[10] The People argue: "In such cases, an enhancement is warranted 'per person' (§ 12022.53, subd. (f)), or per direct participant. Indeed, in such a case, more than one crime occurs; that is, while one person is the actual killer in the sense that his or her bullet caused death, other shooters are merely guilty of lesser related or included crimes."

[11] At the trial, the prosecutor urged the trial court to impose both a section 12022.53, subdivision (d) and a subdivision (e)(1) enhancement because Quash was "shot with multiple guns and multiple bullets from multiple people . . . ." On appeal, the People explain: "[W]hen a defendant participates in a group shooting and it is unclear which shooter inflicted death and which inflicted great bodily injury, the defendant should receive multiple enhancements under subdivision (d) of section 12022.53 for his conduct and that of a principal." As we understand this argument, it is that a defendant convicted of committing a crime involving multiple perpetrators should be treated the same as a defendant convicted of committing multiple crimes.

commission of a felony . . . *personally* and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice . . . ." (§ 12022.53, subd. (d), italics added.) ■ Subdivision (e)(1) imposes vicarious liability under section 12022.53 "on aiders and abettors who commit crimes in participation of a criminal street gang." (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171 [124 Cal.Rptr.2d 464, 52 P.3d 648].) The subdivision (e)(1) enhancement provides for an additional consecutive 25 year to life prison term for "any person who is a *principal* in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of Section 186.22 [street gang participation]. [¶] (B) Any principal in the offense committed any act specified in subdivisions (b), (c), or (d)." (§ 12022.53, subd. (e)(1), italics added.) Finally, section 12022.53(f) provides: "Only one additional term of imprisonment under this section shall be imposed *per person for each crime.* If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment." (Italics added.)

In *Oates*, the defendant was convicted of five counts of attempted premeditated murder based upon evidence that he fired two shots at a group of five people, hitting and injuring just one of them. (*Oates, supra,* 32 Cal.4th at p. 1052.) Our Supreme Court rejected the defendant's contention that the number of subdivision (d) enhancements imposed should be limited to the number of great bodily injuries inflicted. (*Id.* at p. 1056.) It reasoned that the subdivision (d) enhancement applies where a defendant's discharge of a firearm causes great bodily injury to *any person*, not just the intended victim of the underlying crime. The court held that, because section 12022.53(f) requires "one additional term of imprisonment" to be "imposed for each crime," a subdivision (d) enhancement was required to be imposed for each attempted murder conviction, even though only one person suffered great bodily injury. (*Oates, supra,* 32 Cal.4th at p. 1056.) "Had the Legislature wanted to limit the number of subdivision (d) enhancements imposed to the number of injuries inflicted, or had it not wanted subdivision (d) to serve as the enhancement applicable to each qualifying conviction where there is only one qualifying injury, it could have said so." (*Ibid.*) "[T]he Legislature specifically considered the issue of multiple enhancements and chose to limit the number imposed 'for each crime,' not for each transaction or occurrence and not based on the number of qualifying injuries. 'Under the maxim of statutory construction, *expressio unius est exclusio alterius*, if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. [Citation.]' [Citation.] Here, there is no evidence of a contrary legislative intent. Nor is there any reason to believe the Legislature simply overlooked the kind of factual scenario at issue here, which is not particularly unusual." (*Id.* at p. 1057.)

■ *Oates* does not support the People's reading of the phrase "per *person* for each crime" in section 12022.53(f) to mean "per *direct participant* in each crime." On the contrary, inasmuch as the "group shooting" exemption urged by the People is not specified in the statute, under *Oates,* we may not imply that additional exemptions apply absent a clear legislative intent to the contrary. The People have demonstrated no such legislative intent.

The People's reliance on *People v. Corona* (1989) 213 Cal.App.3d 589 [261 Cal.Rptr. 765] (*Corona*), is also misplaced. In that case, a section 12022.7 (personal infliction of great bodily injury) enhancement was imposed based upon evidence that Corona was one of a group of between six and eight men who kicked and beat Michael Golden, causing him great bodily injury. (*Corona, supra,* 213 Cal.App.3d at pp. 591–592.) The court in *Corona* rejected Corona's contention on appeal that the evidence was insufficient to support the enhancement because there was no evidence he personally inflicted any particular injury on Golden. (*Id.* at p. 593.) It explained that a defendant who is guilty as an aider and abettor but strikes no blow is not liable under section 12022.7. (*Corona, supra,* 213 Cal.App.3d at pp. 593–594, citing *People v. Cole* (1982) 31 Cal.3d 568 [183 Cal.Rptr. 350, 645 P.2d 1182] [robber who orders his accomplice to assault victim not liable under § 12022.7 because, for enhancement to apply, accused must be the person who directly acted to cause the injury].) But, "when a defendant participates in a group beating and when it is not possible to determine which assailant inflicted which injuries, the defendant may be punished with a great bodily injury enhancement if his conduct was of a nature that it could have caused the great bodily injury suffered." (*Corona, supra,* at p. 594.) *Corona* does not support the proposition, urged by the People, that a defendant is subject to multiple enhancements because he was one of several participants each of whom engaged in conduct that may have caused injuries to a single victim. Rather, it stands for the proposition that a defendant cannot insulate himself from criminal liability by being one of multiple participants even when proof of the precise level of culpability is wanting.

We conclude that the trial court erred in imposing both section 12022.53 enhancements.[12] We order the abstract of judgment modified accordingly.

4., 5.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[12] Inasmuch as we have found multiple enhancements were proscribed by subdivision (f), we need not resolve whether they were also proscribed by section 654.

*See footnote, *ante,* page 1051.

## DISPOSITION

We direct the clerk to modify the sentence to reflect a term of 50 years to life comprised of 25 years to life for the murder plus a consecutive 25-years-to-life section 12022.53, subdivision (d) enhancement, to amend the abstract of judgment accordingly, and to forward a copy of the amended abstract of judgment to the Department of Corrections. In all other respects, we affirm the judgment.

Boland, J., and Flier, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 16, 2005.