[No. C049931. Third Dist. Dec. 19, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JARVELL DEANDRE SMART et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION***]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I., II.A., III., IV. and V. of the Discussion.

## COUNSEL

Robert Derham, under appointment by the Court of Appeal, for Defendant and Appellant Jarvell Deandre Smart.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant Sergio David Calhoun.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Carlos A. Martinez and Catherine G. Tennant, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DAVIS, Acting P. J.**—A jury convicted defendants Jarvell Deandre Smart (Smart) and Sergio David Calhoun (Calhoun), both 15 years old at the time of the crimes, of two counts of assault with a firearm and one count of shooting at an occupied vehicle. (Pen. Code, §§ 245, subd. (a)(2), 246; see Welf. & Inst. Code, § 707, subd. (d)(2)(B) [trying minors as adults when personally use firearm].)[1]

The jury found that the crimes were committed for the benefit of a criminal street gang, and that Calhoun personally used a firearm and personally inflicted great bodily injury but that Smart did not do so. (§§ 186.22, subd. (b)(1), 12022.5, subds. (a), (d), 12022.7, subd. (a).) The jury also found, under the section 12022.53 enhancement, that a principal (Calhoun) in the offense of shooting at the occupied vehicle (§ 246) personally and intentionally discharged a firearm and caused great bodily injury to both victims. (§ 12022.53, subds. (d), (e)(1).) Pursuant to this finding under section 12022.53, the trial court imposed two consecutive terms of 25 years to life (i.e., 50 years to life) on both Calhoun and Smart, resulting in total sentences of 65 years to life for Calhoun and 53 years to life for Smart.

---

[1] Further undesignated section references are to the Penal Code.

The principal issues in this appeal involve insufficient evidence and the section 12022.53 enhancements.

Although we find the trial court misinstructed on the section 12022.53 enhancement, we find that error harmless. However, in the published portion of this opinion, we find that defendants were charged with and convicted of only one qualifying crime for purposes of section 12022.53, subdivision (f). That subdivision specifies that only one additional term of imprisonment under section 12022.53 can be imposed per defendant "for each crime." Consequently, we strike one of the section 12022.53 enhancements as to each defendant, reducing each defendant's sentence by 25 years. As modified, we affirm the judgment.

## BACKGROUND

About 8:00 p.m. on March 29, 2004, Sabrina Norman and her brother Roy Rayford were fired upon after just entering Norman's white Ford Explorer in the parking lot of the Franklin Villa apartment complex at the G Parkway in Sacramento. Norman explained that she had just moved into a new apartment at the complex next to a friend of hers. The friend's husband, Mtula Payton, known as Big T.C. Deuce, was a member of the Garden Block Crips gang. Payton and another Crip called Capone drove vehicles similar to Norman's Explorer.

After just entering the Explorer, Norman, sitting in the driver's seat, heard a gunshot come from her right side (i.e., the passenger side). Rayford initially said he could not tell the shot's origin, but later stated he thought it came from the driver's side (i.e., the left side) and that it sounded like a nine-millimeter handgun. Norman saw two young men—the taller of the two holding in his right hand a black handgun, pointed downward—standing approximately seven feet from the rolled-down front passenger window of the vehicle. The shorter man did not have a gun.

Norman and Rayford ducked as gunfire erupted on both sides of the vehicle. Norman was hit on her right cheek. The driver's side window shattered and Rayford suffered a bullet wound behind his left ear. The firing continued. Norman was then hit a second time, this time by a shotgun in the upper left arm.

Norman estimated that at least 10 shots were fired over a period of 30 to 40 seconds. She believed she was in a crossfire.

At one point during the barrage, Norman observed the same two young men walk in front of her car. The taller one asked the other, "[D]id you get 'em?"

Frightened and scrunched down, Norman put the Explorer in reverse. With Rayford's help, she backed out. More firing ensued. Norman drove the car to the complex's security booth and Rayford had the security guard call 911.

Norman suffered a three-to-four centimeter gunshot laceration to her right cheek, which caused a scar, and multiple puncture wounds from shotgun pellets, which uncomfortably remain in an eight-inch area of her left arm. Rayford incurred a bullet wound to the left side of his head, which fractured his jaw.

There is some dispute whether Norman told an investigating officer that the two young men she observed—both Black males—were in their mid-20's, or whether she said one looked about 20 and the other 17.

Within days of the shooting, Norman was shown photo lineups that included photos of Calhoun and Smart. Norman did not identify either defendant from the photos, but indicated that one of the photos resembled Calhoun. Norman also reiterated to an officer that she had been caught in a crossfire.

At trial, Norman identified Calhoun and Smart as the two young men she had observed at the shooting, with Calhoun being the taller individual with the gun. At the scene of the shooting, Norman had seen the taller man, who was around five feet 11 inches tall, in her headlights, but the shorter man, who was around five feet eight inches tall, was further back. Norman had told a responding officer that she could probably identify the taller suspect but not the shorter one. Rayford made no identifications in photo lineups or in court.

Carlos Haggerty witnessed the incident from about two blocks away. Haggerty corroborated much of Norman's account of the firing, adding that he saw a man run after Norman's moving car, shooting at it. Haggerty believed that at least two guns were used because he heard "a whole bunch of gun[]fire."

Another witness, Jezmier Slade, was alerted after hearing six to eight rapid gunshots. Slade saw two Black men, one significantly taller than the other, standing beside the driver's door of a white Ford Explorer. The vehicle drove off and the men ran off. As the men ran, Slade saw the taller one holding what Slade thought was a semiautomatic handgun in his left hand. Smart had Slade recalled to testify that one man was about six inches taller and perhaps 40 to 50 pounds heavier than the other.

Calhoun claimed he was five feet 10 inches tall and weighed 143 pounds at the time of the offenses; Smart's comparables were five feet nine inches and

146 pounds. At trial, the two stood next to each other. Smart looked a little shorter.

The day after the shooting, the police investigated at the G Parkway. They arrested 14-year-old Melvin Reno, who claimed to be a Garden Block (29th Street) Crip gang member along with Smart and Calhoun. Reno was on probation for robbery and attempted burglary and wanted to know "what he could get" for talking to the police about the shooting.

According to Reno, on the Saturday before the shooting, Big T.C. Deuce (Mtula Payton) had punched out a Meadowview Blood at a party in the G Parkway.

Testifying at trial in exchange for his relocation, Reno testified that, on the night of the shooting, he was simply walking through the G Parkway when he saw Calhoun, Smart and a Blood named Jacoby James, who was known as "Sir." James fired first at a white Explorer or at Calhoun and Smart, and Calhoun returned fire with a handgun while Smart accompanied Calhoun. Reno speculated that James fired at the vehicle or at Calhoun and Smart in retaliation for the assault on the Blood the previous Saturday (some Crips had similar vehicles), or that Calhoun fired at the vehicle because Sabrina Norman had a son who was a Blood.

The police tried but could not find Jacoby James, but they conceded he had been arrested on an unrelated matter.

Police also interviewed 15-year-old Eugene Gibson, who is Calhoun's nephew. Initially, Gibson denied being at the G Parkway on the night of the shooting. Then he admitted that he and Calhoun were there, and that Calhoun returned fire from some apparently Meadowview Bloods. When the police pressed Gibson about Smart, Gibson stated that Smart was there as well. Gibson added that he did not see a gun in Smart's hands but thought Calhoun and Smart both shot two times, and that Calhoun was firing a handgun that "spits" out shells (no such shell was found at the scene).

Testifying at trial under a grant of immunity, Gibson stated that everything he had told the police before trial was untrue.

The police interviewed both Smart and Calhoun after their arrests. The prosecutor played both tape-recorded interviews for the jury.

Initially, and for hours, Smart denied being present at the shooting. He admitted being a Garden Block Crip (24th Street) gang member (the Garden

Block Crips consist of the 29th, 24th and 21st Street subsets). In a later interview, Smart conceded he was on the scene, but claimed that once he heard the shooting he just ran away. He thought the shooting was against the Crips because they had "stomped a nigger out." At the time of the shooting, Smart claimed he was extremely drunk; as a result, he could not remember if Gibson was also there but Gibson "probably was."

Calhoun, too, initially denied being present at the shooting. In response to continued questioning, though, he later conceded he had been walking through the G Parkway with Smart when he heard an exchange of gunfire and ran away. Neither he nor Smart had a gun. Calhoun informed the officers during the interview and again at its conclusion that he was just telling them what they wanted to hear.

The prosecution's gang expert, a Sacramento police detective specializing in African-American gangs, opined that Calhoun and Smart were members of the 29th Street set of the Garden Block Crips. He also opined that the shooting was between two rival gangs, was likely related to the assault by Mtula Payton (Big T.C. Deuce) on the Blood at the prior Saturday party, and benefited the Garden Block Crip gang.

DISCUSSION

I. *Sufficiency of the Evidence**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

II. *Section 12022.53, Subdivision (d) Enhancement*

As part of their prison sentences Smart and Calhoun each received an additional 50 years to life, comprised of two enhancements of 25 years to life imposed under section 12022.53, subdivision (d) (hereafter section 12022.53(d)). That enhancement applies to personal and intentional firearm discharge that proximately causes great bodily injury in the commission of, among other enumerated crimes, the section 246 offense (shooting at an occupied vehicle).

Two issues are raised. The first is whether the trial court misinstructed on the proximate cause element regarding this enhancement. We conclude the

---

*See footnote, *ante,* page 1216.

trial court did err, but that the error is harmless under any standard of prejudice.

The second issue invokes the limitation under section 12022.53, subdivision (f) (hereafter section 12022.53(f)) that "[o]nly one additional term of imprisonment under this section shall be imposed per [defendant] for each crime." The pleadings charged Smart and Calhoun with only one section 246 offense and essentially one enhancement under section 12022.53(d). We conclude that Smart and Calhoun did not receive fair notice that *two* section 12022.53(d) enhancements could be imposed. Consequently, we strike one such enhancement as to each defendant.

### A. *Misinstruction**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### B. *The Single Count of Section 246 and Its Accompanying Single Allegation of Section 12022.53*

The second issue involving the section 12022.53 enhancement implicates subdivision (f) of that section, the first sentence of which reads: "Only one additional term of imprisonment under this section shall be imposed per person for *each crime*." (Italics added.) The remaining part of subdivision (f) makes clear that the word "person" in this sentence means "defendant."[3]

Here, each of the defendants was charged with and convicted of only one crime that qualified for the section 12022.53(d) enhancement: the section 246 offense of shooting at an occupied vehicle. (§ 12022.53, subds. (a), (d).) Furthermore, as to this single charge of section 246, the information alleged, in a single paragraph, what appears to be an allegation of a single enhancement under section 12022.53, by alleging in full: "It is further alleged that the defendants, Sergio David Calhoun and Jarvell Deandrae [*sic*] Smart, principals, personally and intentionally discharged a firearm, to wit, a handgun, which proximately caused great bodily injury to Sabrina Norman and Roy Rayford, within the meaning of Penal Code Sections 12022.53(d) and (e)(1)

---

*See footnote, *ante*, page 1216.

[3] Section 12022.53(f) provides in full: "Only one additional term of imprisonment under this section shall be imposed per person for each crime. If more than one enhancement per person is found true under this section, the court shall impose upon that person the enhancement that provides the longest term of imprisonment. An enhancement involving a firearm specified in Section 12021.5, 12022, 12022.3, 12022.4, 12022.5, or 12022.55 shall not be imposed on a person in addition to an enhancement imposed pursuant to this section. An enhancement for great bodily injury as defined in Section 12022.7, 12022.8, or 12022.9 shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)."

[subdivision (e)(1) is the section 12022.53(d) enhancement as applied to a principal in a gang crime when another principal commits the section 12022.53(d) act]."

We had the parties supplementally brief the issue of whether section 12022.53(f) means that only one section 12022.53(d) enhancement may be imposed upon each defendant because each of them was convicted of only one qualifying crime (the section 246 offense). (See *People v. Mason* (2002) 96 Cal.App.4th 1, 12 [115 Cal.Rptr.2d 359] *(Mason)* [the only limitation to the number of § 12022.53 enhancements that may be imposed "is that only one enhancement may be imposed per *crime* (i.e., qualifying felony)"] (originial italics); see also *People v. Oates* (2004) 32 Cal.4th 1048, 1057 [12 Cal.Rptr.3d 325, 88 P.3d 56] *(Oates)* [the enactment of subdivision (f) "shows that the Legislature specifically considered the issue of multiple enhancements and chose to limit the number imposed only 'for each crime' "]; *People v. Perez* (2001) 86 Cal.App.4th 675, 680–682 [103 Cal.Rptr.2d 533] *(Perez)* ["The first sentence of section 12022.53, subdivision (f) presents no ambiguity as to the Legislature's intent to apply a limitation to one enhancement per crime"]; *People v. Cobb* (2004) 124 Cal.App.4th 1051, 1056–1058 [21 Cal.Rptr.3d 869] *(Cobb)*.)

Pursuant to our supplemental brief inquiry, a dilemma has been posed as to what constitutes a "crime" for section 12022.53(f) purposes.

On the one hand, California law is well settled that with regard to crimes of violence against persons, such as assault, homicide or robbery, where a single act injures more than one victim, there are as many crimes as there are victims. *(People v. Majors* (1884) 65 Cal. 138, 146–147 [3 P. 597]; *Neal v. State of California* (1960) 55 Cal.2d 11, 20–21 [9 Cal.Rptr. 607, 357 P.2d 839] *(Neal)*; *People v. Lagomarsino* (1950) 97 Cal.App.2d 92, 98–99 [217 P.2d 124] *(Lagomarsino)*; see 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 25, p. 231.) Under this principle of multiple victims-multiple offenses, the defendants here each committed two offenses of section 246 because there were two injured victims; as a result, two section 12022.53(d) enhancements may be imposed upon each defendant pursuant to section 12022.53(f).

On the other hand, however, this principle of multiple victims-multiple offenses has been applied only where each victim is the subject of a *separately charged offense;* that is, the number of offenses charged aligns with the number of victims injured. (See, e.g., *Neal, supra,* 55 Cal.2d at p. 15; *Lagomarsino, supra,* 97 Cal.App.2d at p. 93; *In re Tameka C.* (2000) 22 Cal.4th 190, 192 [91 Cal.Rptr.2d 730, 990 P.2d 603]; *In re Asean D.* (1993) 14 Cal.App.4th 467, 471 [17 Cal.Rptr.2d 572].) In line with this charging

principle, the defendants committed a single offense under section 246 because they were charged with and convicted of only a single such offense; as a result, only one section 12022.53(d) enhancement may be imposed upon each defendant under section 12022.53(f).

For three reasons, we resolve the dilemma of what constitutes a "crime" here for section 12022.53(f) purposes on the basis of the just-noted charging principle. Consequently, each defendant may receive only one section 12022.53(d) enhancement pursuant to the single section 246 offense charged against him, and we will strike the second such enhancement.

First, as the California Supreme Court has made clear, "a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*People v. Mancebo* (2002) 27 Cal.4th 735, 747, 752–754 [117 Cal.Rptr.2d 550, 41 P.3d 556] (*Mancebo*); see also *People v. Riva* (2003) 112 Cal.App.4th 981, 985, 1000–1003 [5 Cal.Rptr.3d 649].)

The defendants did not have fair notice of their potential punishment under section 12022.53(d) of an additional *50* years to life. As noted, the information charged them with only *one* qualifying crime (§ 246) under section 12022.53(d), and alleged the section 12022.53 enhancement in a singular rather than multiple way. Although the verdict forms delineated a section 12022.53(d) enhancement separately as to each victim, that was too late in the game to afford the defendants fair notice of the possibility of two such enhancements. (See *Mancebo, supra,* 27 Cal.4th at p. 752 [fair notice may be critical to a defendant's ability to contest the factual bases for the enhancements, and any plea bargaining requires that a defendant know up front what enhancements the prosecution intends to seek].)

We do not think it is too much to ask that a prosecutor clearly specify in his or her accusatory pleading a defendant's potential for punishment under the section 12022.53(d) enhancement, which tallies 25 years to life per enhancement. The need for such clarity—for fair notice—is aptly illustrated by the present case. For example, Smart was just 15 years old at the time of the section 246 offense. The jury found that he did not personally use a firearm, did not personally discharge a firearm, and did not personally inflict great bodily injury. He was sentenced to the low term of three years on the section 246 offense, but nevertheless received an additional 50 years to life for that crime pursuant to the two section 12022.53(d) enhancements imposed against him. (§ 246.) The probation report, in its sentencing recommendation, noted only one section 12022.53(d) enhancement per defendant.

We recognize that a defendant's culpability is generally greater if he injures multiple victims rather than just one, and such a defendant generally

should receive greater punishment. (See *Neal, supra,* 55 Cal.2d at p. 20.) But a prosecutor may easily account for such increased culpability by charging the number of offenses in line with the number of victims and alleging the appropriate section 12022.53 enhancement as to each offense. The prosecutor did not do so here. Instead, he alleged one offense and essentially one section 12022.53(d) enhancement. A due process lack of fair notice to defendants resulted regarding their enhancement potential.

■ The second reason for using charging principles to resolve the issue here of multiple versus individual enhancement implicates the nature of an enhancement. An enhancement does not define a crime but instead imposes an added penalty when the crime is committed under specified circumstances. (See *People v. Jimenez* (1992) 8 Cal.App.4th 391, 398 [10 Cal.Rptr.2d 281]; see also 3 Witkin & Epstein, Cal. Criminal Law, *supra,* Punishment, § 281, p. 371.) The prosecutor charged defendants with a single crime (§ 246) that constituted the qualifying offense for the section 12022.53(d) enhancement to apply. (§ 12022.53(d).) But the People effectively want the enhancement allegation, which specified two victims, to constitute an allegation of two section 246 offenses. This is the tail wagging the dog, an enhancement defining the crime. This is not legally allowed. In line with the nature of an enhancement, section 12022.53(f) contemplates a separate section 12022.53 enhancement for each separately punishable qualifying offense. Here, there was one separately punishable qualifying offense as to each defendant—the section 246 offense.

■ And finally, along these lines, the cases that have imposed multiple enhancements under section 12022.53(d) on one defendant have aligned each enhancement with a separately punishable (charged and convicted) qualifying offense. (See *Oates, supra,* 32 Cal.4th at pp. 1052–1053, 1056–1057; *Mason, supra,* 96 Cal.App.4th at pp. 3–4, 10–12; *Perez, supra,* 86 Cal.App.4th at pp. 677–678, 680–682; accord, *Cobb, supra,* 124 Cal.App.4th at pp. 1053, 1056–1058 [only a single charged (and convicted) section 12022.53 qualifying offense and therefore only one such enhancement, not two].)

We will strike one of the two section 12022.53(d) enhancements imposed against each defendant.

III.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante,* page 1216.

## Disposition

We direct the trial court to modify defendant Smart's sentence and defendant Calhoun's sentence by striking one of the two section 12022.53(d) enhancements of 25 years to life imposed on each defendant. We also direct the trial court to amend each defendant's abstract of judgment accordingly, and to forward a copy of the amended abstract to the Department of Corrections and Rehabilitation. As modified, we affirm the judgment against each defendant.

Morrison, J., and Hull, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 11, 2007, S149659. George, C. J., did not participate therein.