[No. B206569. Second Dist., Div. Eight. Sept. 22, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD SANDERS, Defendant and Appellant.

COUNSEL

Steven Graff Levine; Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Appellant.

Bonnie M. Dumanis, District Attorney (San Diego), Valerie Summers, Deputy District Attorney; Jan Scully, District Attorney (Sacramento) and Albert Locher, Assistant District Attorney, as Amici Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews, Timothy M. Weiner and Richard S. Moskowitz, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**FLIER, J.**—Appellant Donald Sanders shot two men, Joel M. and Joel's father, Rodney M., during a fight at a party of the Rare Breed Motorcycle Club (Rare Breed). We will refer to the victims as Joel and Rodney, to avoid confusion. They survived and testified against appellant, as did a third eyewitness, Lanny T. (Lanny). Appellant was convicted of two counts of attempted murder and two counts of assault with a firearm, plus firearms discharge and great bodily injury enhancements. He was sentenced to 64 years to life in prison.

Rodney and Lanny knew appellant, and they identified him as one of two shooters. Joel did not see who shot him, but he saw appellant running toward him before he was shot. As to the other shooter (S-1), Joel and Lanny erroneously selected another man, Johnny C., when they were shown a six-pack photographic lineup (six-pack). They corrected that mistake when they saw Johnny in a live lineup. Johnny was dismissed from the case prior to appellant's trial, and no one was tried as S-1. On the other hand, all three eyewitnesses were positive that appellant was one of the two shooters.

Appellant contends that his federal constitutional rights to due process of law and to confront and cross-examine witnesses were violated because the trial court did not strike all of Lanny's testimony or grant a motion for mistrial after Lanny refused to disclose the names of club members who approached him after the shootings and gave him information about S-1's identity. Appellant also contends that the trial court erred in imposing sentence. We agree that the sentence is erroneous and remand with directions to enter a sentence that conforms to law. In all other respects, the judgment is affirmed.

## FACTS

### 1. *Prosecution Evidence*

#### A. *Background*

Lanny was one of the cofounders of Rare Breed when the motorcycle club began in 1989. He was still active in the club in 2005, when the incident occurred. The club had over 100 members at that time. Some of them were law enforcement officers, and some were members of the Crips and Bloods street gangs.

Starting at 3:00 p.m. on September 11, 2005, Rare Breed held a huge party in Gardena to celebrate the grand opening of its clubhouse. The party was open to the public and to the members of various motorcycle clubs. Food and beverages, including alcoholic drinks, were served. There was music and dancing inside the clubhouse, and motorcycles were displayed outside.

#### B. *Joel's Description of the Incident*

Joel, who was in his mid-20's, was not a member of Rare Breed, but his father, Rodney, had been a member for years. Joel and Rodney assisted with providing and serving the food and beverages during the party. At some point, Joel noticed appellant, a bald-headed guest who was talking with other guests. Appellant was of Rodney's generation. Joel had never seen him before.

Around 10:30 or 11:00 p.m., the party was winding down. Joel, Lanny, Joel's girlfriend, and a female cousin of Joel's were among the 10 or so people

still inside the club room. Joel was sweeping the floor. He had drunk alcoholic beverages during the party, but he did not consider himself drunk. He heard an unidentified man (S-1) say the word "blood" and use loud, profane language to the two young women. S-1 was accompanied by an unidentified companion, S-2. Like Joel, S-1 and S-2 were young males in their mid-20's.

The club room was separated from the bar room by a wall that had a door and a window through which drinks were passed. Rodney came into the club room from the bar room and said something to S-1 and S-2. Joel told S-1 the women were his girlfriend and cousin, and there was no need for hostility. He offered to get drinks for S-1 and S-2. S-1 responded with a profane insult. He hiked "up his pants with his fists" and stepped toward Joel as if preparing to fight. Joel was five feet seven inches tall and weighed 148 pounds. S-1 was much larger than that. Joel decided he had better hit first. He struck S-1, who fell to the ground on his back. Joel got on top of S-1 and repeatedly hit him in the face.

Although Joel's attention was focused on S-1, he saw appellant approach him quickly from the "left front." Within seconds, Joel was lifted up from behind and shot in the chest. He did not see who shot him and did not know how close appellant was to him at that time. He fell to the ground, heard more gunshots, and saw Rodney hunched over with his hands on his stomach.

Joel spent several weeks in the hospital recovering from three gunshot wounds. He did not recall receiving the second and third shot. The first shot, to the middle of his chest, caused a collapsed lung. The second shot hit his thigh and testicles. The third shot went across his forehead. While he was in the hospital, he was shown two six-packs by Detective Pohl. He circled appellant's photo in one six-pack because he recognized appellant as the person who approached him before he was shot. From the other six-pack he selected another man as S-1.

After Joel and Rodney left the hospital, they drove together to see two live lineups. While en route, Rodney told Joel that the wrong man might have been selected as S-1. The six-packs had shown only faces, but the live lineups showed entire people. At the first live lineup, which included Johnny, Joel did not identify anyone as S-1. All the men in that lineup were approximately his size, but S-1 was much bigger. At the second live lineup, which included appellant, Joel again identified appellant.

C.  *Rodney's Description of the Incident*

As the party was ending, Rodney was cleaning up in the bar room when he heard arguing in the club room. Leaning out the drinks window, he saw that S-1 and S-2, whom he had never seen before, were speaking disrespectfully to Joel's cousin and his girlfriend. S-1 and S-2 became more aggressive when

he offered them drinks. He left the bar area, went into the club room, and spoke with them. At some point, one of them said "blood" or "Blood, blood," which could be a gang communication. Joel approached and told S-1 and S-2 that the women were his girlfriend and cousin. S-1 cursed and said he did not care. Lanny, who was nearby, attempted "to calm them down." Joel started fighting with S-1 and pinned him to the ground. Rodney grabbed S-2 and hit him in the head, as it looked like S-2 also wanted to fight.

At that point, Rodney saw appellant, whom he knew as "Duck," a member of another motorcycle club. Rodney had previously noticed appellant at the party. He first met appellant two years earlier at another Rare Breed dance and had seen him at other motorcycle group functions since then. Rodney thought appellant would help him to stop the younger men from fighting. Instead, appellant lifted up Joel from the back of the neck and shoulders and shot him in the chest.

Rodney charged at appellant, trying to save his son. Appellant pointed the gun at Rodney and fired. Rodney did not realize he had been shot. He kept moving toward appellant, heard another shot, and felt a bullet hit his knee. Falling to one knee, he saw that S-1 had risen from the ground and fired another gun, which then jammed. Appellant grabbed S-1 and ran outside with him. Rodney started to follow them, became aware that he was wounded in the stomach, and collapsed. He spent almost three months in the hospital and needed several operations.

Once Rodney was able to communicate at the hospital, Detective Pohl visited him and showed him a six-pack. Rodney circled appellant's photo on the six-pack and wrote, "He shot me." He was positive about that identification, as he knew appellant.

At the trial, Rodney also testified that he selected Johnny as S-1 when he was shown the other six-pack. Detective Pohl's testimony showed that Rodney was confused about that point. Pohl did not show Rodney the six-pack with Johnny's photo because Rodney told Pohl he focused his attention on appellant and did not believe he could identify the other gunman. Joel and Lanny, but not Rodney, identified Johnny as S-1 from the six-pack that contained Johnny's photo.

Rodney further testified that, after he was released from the hospital, the "older guys" in the neighborhood told him that the wrong person had been identified as S-1, as Johnny did not attend the party. Rodney wanted to be absolutely sure, to avoid having an innocent person incarcerated. People in the neighborhood also told him that his identification of appellant was wrong, but he rejected that information because he was acquainted with appellant and knew he had seen him.

Rodney told Joel prior to the live lineups that the six-pack identifications of S-1 might be incorrect. At the live lineups, Rodney did not recognize anyone in the first lineup, but he again selected appellant from the second lineup. He had no feud or "beef" with appellant prior to the shooting.

### D. *Detective Pohl*

Detective Pohl obtained descriptions of the incident from Rodney, Joel and Lanny. Rodney told Pohl that appellant shot him, he had spoken with appellant at previous motorcycle events, appellant was known as "Duck," and he belonged to a motorcycle club called "Divided Times." When Pohl showed the three witnesses the six-pack with appellant's photo, Rodney and Lanny identified appellant as one of the two shooters, and Joel said he had seen appellant at the party. Joel and Lanny identified Johnny as the other suspect, S-1, from the other six-pack. When Pohl told Rodney that a live lineup was scheduled, Rodney said there were concerns about the identifications of S-1, but not of appellant. At the live lineups, the three witnesses identified appellant, and none of them identified Johnny.

On cross-examination, after the court overruled the prosecutor's relevancy objections, Detective Pohl explained that he put Johnny's picture into a six-pack because (1) Rodney, Lanny and Joel told him that S-1 was a local Blood gang member known as "J"; and (2) he learned from police gang records and a confidential reliable informant that J or "J-Wac" was the gang name of Johnny, who belonged to a local Blood gang. After Pohl learned that Johnny was not S-1, Johnny was released, and Pohl never found out the real identity of S-1. Pohl tried to get club membership information from Lanny, but Lanny would not provide it.

### E. *Lanny's Description of the Incident*

Lanny drank no alcoholic beverages at the party. He was in the club room cleaning up when he saw appellant, whom he knew, enter the room with S-1 and S-2, whom he did not know. Lanny and Rodney were the only club members in the building at that time. S-1 was tall and wore a red sports jersey. S-1 and S-2 said "blood" while speaking to each other. S-1 spoke offensively to the two young women standing at the drinks window. Rodney told S-1 not to be disrespectful to females. Joel approached S-1.

At that point, Lanny positioned himself between Joel and S-1, hoping to stop a fight. Appellant stood off to the side. S-1 spoke aggressively and showed Lanny a gun in his waistband. Lanny tried to calm S-1. Joel stepped from behind Lanny and hit S-1, who fell to the ground. Joel continued fighting him while on top of him. S-1 pulled out his gun. Appellant, now also holding a gun, pulled Joel up by the collar. That action by appellant put Joel in a position to be shot by S-1. S-1 had trouble with his gun, but he shot Joel once. Appellant then shot Joel twice. The two women ran from the room.

Rodney ran toward appellant, who shot Rodney twice. Appellant and S-1 ran outside. Lanny and Rodney followed them part of the way. S-1 and S-2 drove off together in a car. Appellant rode off on his motorcycle. Lanny then assisted Rodney, who was wounded.

When the police arrived, Lanny told them about the incident, identified appellant as one of the shooters, and indicated where appellant could be found. Lanny later selected a photo of appellant from a six-pack. Lanny also picked out, from another six-pack, a photo of a man who looked like S-1. When he saw a live lineup with that man in it, he realized that man was not S-1. Lanny was absolutely certain that appellant shot Rodney and Joel.

Lanny was extensively cross-examined about all of his direct testimony, including the incident, his previous identifications of the two shooters, and his preliminary hearing testimony. He insisted that the only people in the room were the ones he had already named. He explained that, even though members of motorcycle clubs do not like to come to court, he had been willing to do so because he witnessed the shootings and did not want the problem to "escalate to another level" on the street. In response to questions from defense counsel, he added that a couple of members of Rare Breed, whose names he refused to divulge, told him that S-1 was a Blood gang member whose nickname was J. He gave that information to the police. When he saw Johnny in a six-pack, he identified Johnny as S-1, because Johnny looked "similar" to S-1. He learned from unidentified people, prior to the live lineup, that he had mistakenly selected Johnny in the six-pack. He personally realized that mistake when he saw Johnny in a live lineup.

We will discuss, *post*, the problems during Lanny's recross-examination when defense counsel asked for the source of Lanny's information about S-1.

## F. *Deputy Vizcarra*

Deputy Vizcarra arrived at the club room, saw paramedics treating Joel and Rodney, and interviewed Lanny. Lanny's description of the incident included the fact that one of the two shooters was "Duck," the president of another motorcycle club, "Divided Times."

## 2. *Defense Evidence*

### A. *Don C.*

Don C. belonged to another motorcycle club and was a longtime friend of appellant's. When he arrived at the party about 9:15 p.m., he saw appellant across the street from the clubhouse building. Don went inside and saw about

60 people drinking and dancing in the club room. He later noticed a crowd in a corner, heard a gunshot, ran outside, and heard another gunshot inside the building. Appellant was still outside, across the street.

## B. *The Defense Criminalist*

The hospital medical records of Joel and Rodney showed their blood-alcohol levels after they were shot. Joel's blood-alcohol level was 0.22 percent. In the opinion of the expert, that level meant that Joel would have been impaired, mentally and physically. Rodney's blood-alcohol level was 0.12 percent, which the expert believed was enough to impair Rodney's observations and memory.

## C. *Gary Austin*

Gary Austin, who was Johnny's defense attorney, gave the former prosecutor on the case the names of Johnny's alibi witnesses. Rodney approached Austin at the live lineup and apologized for his prior misidentification of Johnny.

## D. *Latanya G.*

Latanya G. went to the Rare Breed party while Johnny, who was her neighbor, babysat for her at their apartment complex. Latanya arrived at the party around 9:00 p.m. Fifteen or 20 minutes later, she heard men arguing. One of the arguers was a tall man in a red jersey. The clubhouse was filled with people. Latanya left because the man in the red jersey raised his shirt at his waistband, as if he had a weapon. She saw appellant outside the building when she arrived at the party and when she left it. She heard gunshots as she was driving home. When she got there, she saw Johnny, whose nickname was J.[1]

## E. *Lori-Ann Jones*

Lori-Ann Jones was the former prosecutor on this case. Johnny was dismissed from it after the live lineup because the eyewitnesses said that Johnny was not S-1. Law enforcement officers later had information about S-1's real identity, but no one else was prosecuted as S-1 due to the past misidentification of S-1.

---

[1] The prosecutor argued to the jury that the defense witnesses Don and Latanya were wrong when they testified that appellant was not in the club room when the shootings occurred.

### F. *Detective Pohl*

During his investigation, Detective Pohl spoke on the telephone with Detective Lewis, who belonged to Rare Breed. Lewis told Pohl that he was inside the building, in a bathroom, when he heard a popping noise that could have been gunshots.

## 3. *Prosecution Rebuttal Evidence*

### *Regina M.*

Regina M. was Joel's girlfriend. Late in the party, as people were leaving, she was standing at the drinks window with a female friend. Someone behind her repeated the word "blood." She said, "Oh, s---," as she was concerned about gang trouble. One of the men cursed at her. Rodney came out from the bar area and Joel walked over. A fight started. Regina heard shots, so she ran with her girlfriend into the bar room. When she came out, she saw that Joel and Rodney were wounded. She left with Joel in the ambulance. She could not identify anyone.

## DISCUSSION

## 1. *Refusal to Strike Lanny's Testimony*

During recross-examination, Lanny would not answer questions about who originally told him that a gang member named J was S-1, who later told him that Johnny had wrongly been identified as S-1, and who told him S-1's real identity. The trial court allowed very broad questioning on that issue and gave the jury a special instruction about it, but it refused to strike Lanny's testimony or grant a mistrial. Appellant contends that those rulings deprived him of his Sixth and Fourteenth Amendment rights to due process of law and to confront and cross-examine witnesses. (U.S. Const., 6th & 14th Amends.)

### A. *The Record*

During recross-examination, defense counsel repeatedly asked for the source of Lanny's information that S-1 was a Blood gang member named J. Lanny said a couple of friends of his who knew J gave him that information, it "was pretty reliable," and he passed it on to law enforcement. He would not divulge who told him about J, as those people were "not involved in this." Defense counsel argued that the information led to "the identification [of] an innocent man," and it was needed to "understand the quality of the information you got from these people." The prosecutor made a relevancy objection. The court overruled the objection, finding that the questions were relevant

because they concerned credibility and Lanny's ability to identify appellant. Lanny steadfastly refused to name his sources.

The court had the jurors go to the jury room. It told Lanny that he could be held in contempt of court if he continued to refuse to answer the questions. The prosecutor wondered whether answering the questions could put Lanny in physical danger. The courtroom was cleared. Lanny testified, on voir dire, that he had received the information in confidence, and not so that he could pass it on to the police. It was possible that he could be killed if he named his sources, as they were criminal types who possessed weapons and had reputedly engaged in harm. They had sought him out. They lived in the area of Compton and Gardena. He would refuse to disclose his sources even if the court ordered him to do that. After further discussion, the proceedings were adjourned to the following Monday.

When the proceedings resumed that Monday, Lanny still refused to name his sources. The prosecutor argued that Lanny needed counsel, the proceedings had become a trial of Johnny rather than of appellant, and what Lanny learned from other people about S-1's identity was unreliable, irrelevant hearsay. The defense maintained that there had been a denial of the rights to due process and cross-examination that required the striking of Lanny's testimony. The court ordered Lanny to name his sources. He refused. The court was concerned that the issue arose after Lanny had already given extensive testimony, and when the defense intended to call witnesses who would testify that appellant was not in the clubhouse when the shooting occurred. It believed Lanny's refusal to name his sources resulted from the "credo" of motorcycle clubs rather than a real fear of harm. After carefully considering its options, it decided that it would not strike Lanny's testimony but would give a special instruction and allow the defense wide latitude in further questioning of Lanny. A defense motion for mistrial was denied.

During further broad-ranging recross-examination, Lanny explained that there had been a meeting of about 100 Rare Breed members the previous day, at which he assured the members that he had not given out information about them. The same club members who originally told him about J later approached him and told him a mistake had been made, as S-1 was not Johnny but was a different Blood gang member who was also known as J. Lanny passed on that additional information to Detective Pohl without disclosing who gave it to him. He testified that his sources would have come to court themselves if they wanted their names known. The primary person who told him S-1's true identity had been at the club meeting the previous day. Lanny insisted that appellant knew who S-1 was, since appellant entered the club room with S-1 and S-2 before he shot Joel and Rodney.

The court's final instructions included this special instruction about Lanny's testimony: "If you find that Lanny . . . attempted to suppress evidence in any manner, such as by concealing potential evidence, or refusing to answer questions despite being ordered to do so by the court, you may consider this attempt as a circumstance tending to distrust the entirety of his testimony. You may reject the whole testimony of Lanny . . . as a result, unless, from all of the evidence, you believe the probability of truth favors his testimony in other particulars."

## B. *Analysis*

In addressing the question whether the trial court's ruling and instruction were correct,[2] it is well to place the situation encountered here into a broader context.

At one end of the spectrum are cases when the party testifying on his or her own behalf unjustifiably refuses to answer questions necessary to complete the cross-examination. 1 McCormick, Evidence (6th ed. 2006) Cross-examination, section 19, page 110, states that in such cases the consensus is that the direct testimony must be stricken. One of the cases cited by McCormick in support of this proposition is *People v. McGowan* (1926) 80 Cal.App. 293, 297–298 [251 P. 643], where the defendant on direct examination testified as an alibi that on the night of the crime he took a woman home but on cross-examination refused to give her name and address. A more recent case that also involves a testifying defendant whose entire testimony was stricken is *People v. Seminoff* (2008) 159 Cal.App.4th 518, 525–528 [71 Cal.Rptr.3d 582].

At the other end of the spectrum are cases where a nonparty witness has testified on direct examination and where he or she is asked a question on cross-examination that relates only to the witness's credibility and the witness refuses to answer. Here, McCormick notes the direct testimony should not be stricken, "or at the least the judge ought to have a measure of discretion in ruling on that matter." (1 McCormick, Evidence, *supra*, Cross-examination, § 19, p. 111.) Among other cases, McCormick cites in support of what he states is the leading case, *U.S. v. Cardillo* (2d Cir. 1963) 316 F.2d 606 (*Cardillo*). Cardillo has characterized such cases as ones where the testimony involves "collateral matters or cumulative testimony concerning credibility

---

[2] Respondent asks us to utilize an abuse of discretion standard and find that no abuse of discretion occurred. We cannot analyze the case on that basis, as the issue of federal constitutional error was raised below and has been repeated on appeal. We utilize independent review in analyzing the issue. (*People v. Cromer* (2001) 24 Cal.4th 889, 901–902 [103 Cal.Rptr.2d 23, 15 P.3d 243] [independent review, not abuse of discretion, standard applicable to whether witness was legally unavailable].)

which would not require a direction to strike and which could be handled (in a jury case) by the judge's charge if questions as to the weight to be ascribed to such testimony arose." (*Id.* at p. 613.)

Between these extremes are cases where a nonparty witness refuses to be cross-examined on the merits. McCormick states that the proper remedy is to strike the direct examination, although the judge should have some discretion in the matter. (1 McCormick, Evidence, *supra*, Cross-examination, § 19, pp. 110–111.)

There is California precedent for what *Cardillo* characterizes as testimony about collateral matters.

In *People v. Robinson* (1961) 196 Cal.App.2d 384 [16 Cal.Rptr. 484] (*Robinson*), Marvin Lee had pleaded guilty to burglary and was testifying at the preliminary hearing of Robinson who had participated in the burglary. Lee refused to answer on cross-examination the question that inquired to whom Lee had sold the stolen property. Although Robinson's lawyer moved to strike all of Lee's testimony, the magistrate struck only that portion of the testimony that related to the disposition of the stolen merchandise. (*Id.* at pp. 387–388.) Relying largely on what is now 5 Wigmore, Evidence (Chadbourn rev. 1974) Conduct on Cross-examination, section 1391, pages 137–140, the court noted that where the witness completely refuses to be cross-examined the direct testimony should be struck but the refusal to answer one or two questions on cross-examination need not lead to this result. Here, the matter should be left to the trial judge, who should look to the " 'motive of the witness and the materiality of the answer.' " (*Robinson, supra,* at p. 390.) (It is noteworthy that Wigmore cites *Cardillo* in support of this proposition, i.e., 5 Wigmore, *supra,* § 1391, pp. 137–138, fn. 2.)

*People v. Reynolds* (1984) 152 Cal.App.3d 42 [199 Cal.Rptr. 379] (*Reynolds*) was a case where the defendant was charged with attempted escape from jail. He testified that he broke the window glass to his cell in order to smuggle drugs into the jail after he had been pressured to do so by other inmates. On cross-examination he refused to give the names of the inmates who had pressured him. (*Id.* at p. 45.) The appellate court upheld the order striking his entire testimony. (*Id.* at p. 47.)

Citing *Robinson*, the *Reynolds* court observed: "In light of the critical right involved, the trial court should also realize that striking a defendant's entire testimony is a drastic solution, which is to be used after less severe means are considered. For example, a partial strike is within the discretion of the trial court." (*Reynolds, supra,* 152 Cal.App.3d at pp. 47–48.) The court also noted that "[a]nother option to be considered is that the defendant's

failure to respond to cross-examination may be considered by the jury in evaluating his or her credibility." (*Id.* at p. 48.) This was the option chosen by the trial court in this case.

At least two relatively recent cases have recognized that striking a witness's entire testimony is a drastic solution and that there are alternatives when the witness has refused to answer one or two questions on cross-examination on matters that are collateral, such as credibility. (E.g., *People v. Seminoff, supra*, 159 Cal.App.4th at pp. 525–526; *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1247–1248 [268 Cal.Rptr. 884].)

The aforesaid rule makes sense in terms of the constitutional values that are implicated. While cross-examination is curtailed because the question will not be answered, there is a compensating benefit in that the jury is empowered to conclude that the witness is not credible, or is not entirely credible; that might well have been the whole point of the unanswered question. On the other hand, the wholesale striking of otherwise admissible testimony is avoided, which is a plus in the search for the truth.

■ In sum, there is solid support, both judicial and scholarly, for the proposition that when one or two questions asked during cross-examination are at stake and those questions relate to a collateral matter such as the nonparty witness's credibility, the trial court need not strike the entirety of that witness's direct testimony.

We proceed to apply the foregoing to Lanny's testimony and the evidence.

Lanny's, Joel's and Rodney's identifications of appellant were firm and unequivocal. In fact, Lanny testified that he was absolutely certain that appellant shot Joel and Rodney. It is also true that the account these three witnesses gave of the shooting and what led up to it was consistent. Importantly, Lanny was extensively and exhaustively cross-examined about what he himself did and observed at the time of the incident.[3]

Regarding S-1, Lanny testified that he had never seen that person before, that he mistakenly identified Johnny as S-1 from a six-pack, and that he corrected that mistake when he saw Johnny in person at the live lineup. Lanny also stated that his undisclosed sources told him that he mistakenly identified Johnny as S-1, the other shooter. These sources never suggested that they themselves witnessed the incident or that Lanny's identification of appellant was mistaken.

---

[3] Appellant's brief states that Lanny "absolutely refused to be cross-examined about the detailed testimonial observations he had related on direct examination." Actually, there was extremely detailed and repetitive cross-examination of Lanny on that subject.

The one question Lanny refused to answer was the identity of the persons who told him that S-1 was not Johnny and that S-1 was a Blood gang member named J.

It is important to note that the identities of the persons who told Lanny about S-1 stand in isolation from the facts of this case. These identities have no relationship to Lanny's account of the shootings and his unequivocal identification of appellant. (While these identities may bear on the identification of S-1 as gang member J, the fact is that it does not matter whether S-1 was J or was not J.)

Appellant argues, however, that if he had known who spoke to Lanny about S-1, that information *might* have led him to S-1, S-2 and other percipient witnesses, who *might* have provided information to impeach the identifications of him that were made by Lanny, Joel and Rodney. He analogizes this case to other types of witness problems, such as informers who are material witnesses (*Eleazer v. Superior Court* (1970) 1 Cal.3d 847, 849 [83 Cal.Rptr. 586, 464 P.2d 42]) and percipient witnesses whose safety is in danger (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1146–1147 [99 Cal.Rptr.2d 149, 5 P.3d 203]).

The abstract possibility that the people who told Lanny about S-1 knew of witnesses who could show that Lanny, Joel and Rodney were wrong rests on two assumptions that have no bases in the facts of this case.

The first assumption is that there are undisclosed eyewitnesses to the melee and the shootings. There is simply nothing to support this. Lanny, for one, insisted that he had identified all the persons who were present in the room when the shooting occurred. It is also to be kept in mind that several parties investigated the circumstances of these shootings and apparently none produced any witnesses other than those already identified. Had these investigations uncovered other witnesses, particularly witnesses who had different versions from that provided by Lanny, Joel and Rodney, it is almost certain that they would have been called as witnesses.

The second assumption is that these undisclosed eyewitnesses would contradict Lanny's, Joel's and Rodney's testimony. Although we grant that anything is possible, there must at least be some indication that these (unknown, unidentified and anonymous) persons would contradict the witnesses who testified. We see no indication of this. In fact, indications are to the contrary because the various accounts were largely consistent, which is notable when various people witness quickly unfolding, dramatic events.

The instruction that the court gave about Lanny's testimony empowered the jury to wholly disregard Lanny's testimony. This handed the defense a potent

weapon vis-à-vis a very important witness at the cost of not learning the identities of two people who were completely marginal to this case.

We conclude that the trial court did not err in proceeding as it did in response to Lanny's refusal to identify his sources.

### 2. The Sentencing Issue

There was no finding of premeditation. The penalty for the attempted murders in counts 1 and 2 was therefore a determinate term of five, seven or nine years (Pen. Code, § 664, subd. (a)), plus applicable enhancements.[4]

On count 1, the court imposed the middle term of seven years, plus 25 years to life for a firearms enhancement under section 12022.53, subdivision (d). On count 2, the court added a full consecutive sentence of seven years, plus 25 years for the firearms enhancement. It stayed the two other counts and the great bodily injury enhancements, resulting in a total sentence of 64 years to life.

■ Appellant contends that the penalty for the offense in count 2 should have been two and one-third years, one-third of the midterm, instead of the full middle term. In other words, appellant seeks to invoke the provision of the Determinate Sentencing Act (DSA; § 1170 et seq.) that mandates a subordinate term to consist of one-third of the middle term (§ 1170.1, subd. (a)). We agree.

■ The decisive point is that an indeterminate enhancement does not merge with the determinate offense to make the entire term encompassed by the indeterminate sentencing law. (*People v. Montes* (2003) 31 Cal.4th 350, 358–359 [2 Cal.Rptr.3d 621, 73 P.3d 489] (*Montes*).) That is, the sentence imposed for the offense does not merge with the sentence on the enhancement. (*Ibid.*) In legal contemplation, the count and the enhancement remain distinct.

Respondent contends that *Montes* does not apply because it addresses only section 186.22, a provision contained in the California Street Terrorism Enforcement and Prevention Act (§ 186.20 et seq.).

*Montes* addressed the question whether it was error to apply the mandatory minimum life sentence set forth in section 186.22, subdivision (b)(5)[5] when

---

[4] All further statutory references are to the Penal Code.

[5] "Except as provided in paragraph (4), any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life shall not be paroled until a minimum of 15 calendar years have been served." (§ 186.22, subd. (b)(5).)

the defendant was sentenced to seven years on the base term, plus a consecutive term of 10 years under section 186.22, subdivision (b)(1)(C) and a further consecutive term of 25 years to life for a firearm enhancement under section 12022.53, subdivision (d). The Court of Appeal in *Montes* had concluded that the firearm enhancement under section 12022.53, subdivision (d) rendered the entire sentence as one for imprisonment for life, thus invoking section 186.22, subdivision (b)(5). (*Montes, supra,* 31 Cal.4th at pp. 354–355.)

The Supreme Court disagreed, explaining: "The Court of Appeal in the present case looked to a *different* section of the Penal Code (section 12022.53(d)), not incorporated in the language of the felony provision itself (attempted murder), in order to find that the felony provided for a life term. We decline to interpret the attempted murder statute in the manner suggested by the Court of Appeal because the enactment of a statute that provides for a term of life imprisonment is best left within the province of the Legislature. As we stated in *People v. Wims* (1995) 10 Cal.4th 293, 307 [41 Cal.Rptr.2d 241, 895 P.2d 77]: 'Nor does [the dissent] explain why, if our Legislature intended a sentence enhancement to be "part of the criminal offense to which it is attached" [citation], it did not simply say so. When the Legislature wishes to create a substantive offense having as one of its elements another substantive offense, it knows how to do so.' " (*Montes, supra,* 31 Cal.4th at pp. 358–359.) *Montes* went on to point out that when the Legislature intended to fuse the enhancement with the base term, it expressly did so, pointing as an example to subdivision (b)(4)(A) of section 186.22.[6] (*Montes, supra,* at p. 360.)

We disagree with respondent's claim that *Montes* does not apply for two reasons.

First, *Montes* holds that one must look to the sentence of the base term and not an enhancement to decide whether the term is determinate or indeterminate. This is so, according to *Montes*, "because the enactment of a statute that provides for a term of life imprisonment is best left within the province of the Legislature." (*Montes, supra,* 31 Cal.4th at p. 359.) It is also true, again according to *Montes*, that when the Legislature decides to merge the base term and the enhancement, it will say so. These are general principles that are not limited to section 186.22.

---

[6] "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of: [¶] (A) The term determined by the court pursuant to Section 1170 for the underlying conviction, *including any enhancement* applicable under Chapter 4.5 . . . ." (§ 186.22, subd. (b)(4)(A), italics added.)

Second, the enhancement the Court of Appeal in *Montes* decided made the entire sentence indeterminate was section 12022.53, subdivision (d). That is the same section that respondent contends in this case makes the entire sentence indeterminate. *Montes* rejected this suggestion. (*Montes, supra*, 31 Cal.4th at pp. 358–360.) In other words, *Montes* speaks directly to the issue before us.

Given that the sentence on the enhancement does not affect the sentence on the base term, the text of section 1170.1 takes us the rest of the way. Under subdivision (a) of section 1170.1, there is a principal term and one or more subordinate terms. "The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes . . . ." (§ 1170.1, subd. (a).) Subdivision (a) of section 1170.1 goes on to provide that the "subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed . . . ."

■ The foregoing represents a legislative judgment that, if the principal term is a determinate term, consecutive subordinate terms generally should be of lesser duration than the principal term. In order to carry this into effect, one needs to look only to the principal term and not to the enhancements, if any, of the principal term. In other words, the subordinate term is related to the principal term and not to an enhancement of the principal term. Section 1170.1 therefore applies, provided that the principal term is a determinate term.

■ *People v. Mason* (2002) 96 Cal.App.4th 1 [115 Cal.Rptr.2d 359] is consistent with the foregoing. In that case, even though the principal term of five years was enhanced with a 25-year-to-life enhancement, the five subordinate, consecutive terms were one-third of the midterm sentences for those offenses. (*Id.* at pp. 3–4, 14–15.) In our opinion, however, one passage in *Mason* requires some clarification. That passage is: "Thus, the DSA sentencing scheme only applies when *all* the terms of imprisonment are 'determinate,' i.e., of specified duration. [Citation.] Where there are both determinate and indeterminate sentences, the provisions of the DSA, and more particularly section 1170.1, do not apply." (*Id.* at p. 15.) The phrase "*all* the terms of imprisonment" must be understood to refer to terms of imprisonment imposed for offenses.

In light of the foregoing, the case must be remanded with directions to modify the sentence and to issue a corrected abstract of judgment.

## DISPOSITION

The judgment is reversed to the extent that it imposes a term of seven years on count 2 and the case is remanded with directions to impose one-third of the midterm for this offense. In all other respects, the judgment is affirmed.

Bigelow, P. J., and Rubin, J., concurred.

A petition for a rehearing was denied October 21, 2010, and appellant's petition for review by the Supreme Court was denied February 16, 2011, S188600.