Filed 3/10/26

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B338672 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. KA117390 |
| ISAIAS DEJESUS VALENCIA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mike Camacho, Judge.  Affirmed and remanded with directions.

George Schraer, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jonathan J. Kline and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Isaias Valencia used methamphetamine and cocaine and began driving his pickup. He would not comply with police orders to pull over. Police chased Valencia until he crashed into a parked car. He jumped out, ran to his nearby apartment, and barricaded himself in his bedroom. Thus began an overnight standoff in which the 38-year-old Valencia would shoot one officer to death and seriously wound another. A SWAT team eventually blew through his bedroom wall and blasted down his bedroom door. The jury convicted Valencia of murder and other felonies.

Valencia's appeal challenges the warrantless entry of police into his apartment. We hold that jurors could find exigent circumstances justified the initial warrantless entry and, further, that police did not need to seek a warrant once they were in the apartment.

We likewise reject Valencia's claim that, because he fired only six rounds, he could be convicted of only six crimes.

The prosecution agrees with Valencia that the trial court committed sentencing errors, which we order corrected on remand. Undesignated code citations are to the Penal Code.

I

At about 8 p.m., the Pomona Police Department dispatched officers to Palomares Street to look for a drunk driver. The officers sought a Chevy Silverado pickup. On that street they saw Valencia in a Silverado. Police turned on their overhead lights, and Valencia took off. He drove on the wrong side of the road, ignored stop signs, and broke the speed limit. The car chase ended when Valencia crashed.

Valencia's route was peculiar: it was circular, not linear. He drove south on Palomares, made a U-turn, drove north on the same street, made another U-turn to drive south again, and U-

2

turned again to drive north, all on the same street. Then he turned left and drove around the block. Finally, he crashed into a parked car across the street from where police had first seen him. Valencia had led police on a high-speed, reckless chase that ended where it began. The chase did not fit the standard pattern of a desperate effort to get away.

There was another irregular aspect to this pursuit. Valencia stuck his head out of his window and laughed at the police. He was "wide eyed." The prosecution argued Valencia was "taunting" the police.

After his crash, Valencia leapt from the truck and sprinted to a nearby apartment building. Officers ran after him, leaving both doors of their police cruiser standing open: their pursuit was hot. They lost sight of Valencia momentarily, but a member of Valencia's family led them to his apartment.

Police rushed into the apartment through the front door, which was open. As they entered, they saw the same family member standing outside a closed interior bedroom door. She was calling to Valencia, using his first name.

Officers asked whether there were guns or weapons in the apartment. That family member said no. Valencia's brother, on the other hand, might have—at least at some point—conveyed to police that Valencia had a knife and it seems there was some concern for the safety of the family members who also occupied the apartment and had summoned the police.

Had these local patrol officers believed Valencia was armed with a gun, they would not have tried to enter the apartment on their own, but would have consulted their watch commander for strategy. As it was, however, the sergeant on the scene saw no need for a SWAT unit.

Officers heard Valencia in the bedroom moving furniture and concluded he was barricading the bedroom door. They called for him to come out. Valencia would not come out.

Police huddled to work out a plan. They did not know the layout of the apartment complex. One said "we don't know what's gonna happen." The police department began sending more resources to the standoff.

First, police attempted further negotiations. They kept knocking on the door, calling out, and were constantly addressing Valencia. They shouted, "We are police officers. We're not here to hurt you. We're here to help you. We need you to come out and talk to us." "Please come out." The police made these announcements in person from inside the apartment in English and Spanish, and then also from an outside public address system on an armored unit called a BearCat they brought to the scene. Valencia did not respond or come out.

Then police announced they now had a police dog: "We have a K-9. We'll send in the dog and it will bite you." Valencia did not come out.

When the Pomona police despaired of coaxing Valencia out, they called for a battering ram and a "ballistics shield." One officer was in charge of the ram and another—Officer Greggory Casillas—held the shield. Many officers lined up behind the ram and the shield. The officer with the ram opened the bedroom door. Casillas charged in with the shield, with other officers following in a line behind him.

Using a .357 magnum revolver, Valencia shot Casillas in the forehead and Officer Alex Nguyen in the cheek.

To escape flying bullets, other officers in the entering line dodged into an adjoining bathroom. Crossfire trapped three officers in that bathroom.

Officers dragged Casillas out of the apartment. Casillas died. Nguyen survived, but the bullet in his face meant he would have trouble opening his mouth or speaking.

Police kept shooting at Valencia, which allowed the three trapped officers to escape to safety.

At this point, the local Pomona department asked the Los Angeles County Sheriff's Department for help. The Sheriff's Department is much larger than the local Pomona force. With some 10,000 officers, the Sheriff's Department had more specialized units and equipment than did the local police.

The Sheriff's SWAT team arrived shortly before midnight and took over. This team's pressing business was to interview those present and to size up the deadly emergency. Where was Valencia? What was known of his mindset? Did Valencia have hostages? Were others in the bedroom? What innocent people might be in danger? The SWAT commander testified that answers to these questions could change "the tactical situation completely."

The SWAT team concluded Valencia probably was in the bedroom alone. But they were unsure: their conclusion might be incorrect. The SWAT decisionmakers continued to appraise the uncertainties of the situation.

The team evacuated residents from other apartments to avoid gunfire injuries to innocent bystanders. The standoff had trapped people in the surrounding apartments. The SWAT team hurried them out.

The SWAT team formulated a plan to encourage Valencia to come out voluntarily. The goal was a peaceable solution, for Valencia's sake as well as their own. As the SWAT commander testified, when someone is in their own place, they know where everything is. Police, on the other hand, "have no idea." Thus the officers were "at a disadvantage when we go inside a location; so ideally we want people to come out to us."

At the same time, their imperative was to end the encounter as swiftly as possible. "If you don't take action, bad things can happen." The commander told the jury about the "Uvalde school incident," where regrettably police on the scene delayed action and, as a result, more "kids are getting shot." The SWAT team concentrated on avoiding unnecessary and dangerous delay as well as hasty missteps.

Simply waiting Valencia out was an unattractive option. Valencia had a gun. He had an unknown amount of ammunition, food, and water. Waiting him out could take days, meaning during that time neighbors would be homeless and without access to their clothing and belongings. The neighborhood would remain in crisis. Many police would be diverted from other emergencies. There was a premium on resolving the situation.

Throughout the standoff, the SWAT team kept trying to communicate with Valencia, in English and in Spanish. They tossed a phone into the bedroom. They recorded a message from Valencia's mother, urging him to come out. They got a crisis negotiation team to report to the scene, because Valencia was refusing to use any device. The team spent hours on these efforts. Valencia did not respond. "I don't remember him ever communicating with us."

The SWAT team put a camera in through the rear window of the apartment. The images showed Valencia had piled everything in the room, including the contents of the closet, into one big heap against the door. The pile reached nearly to the top of the door. "There was debris everywhere. There was clutter everywhere." The SWAT team saw Valencia "making strange gestures. It was just -- in my opinion, just erratic. There was no rhyme or reason" to Valencia's conduct.

The SWAT team next tried "cold" and "hot" gas canisters— like tear gas, but more potent. Valencia tolerated each gas bomb, however, by burying his head in the clothing on the ground. More than 10 successive gas canisters failed to dislodge him.

The SWAT team eventually resorted to explosives. One explosion ripped the bedroom door off its hinges. Other charges blasted holes through the common wall of the adjoining apartment. The side holes were preparation for possible entry through the bedroom doorway so, "in case this individual wanted to shoot at us, we had some support from that side."

The SWAT team warned Valencia they would send their police dog in if he did not come out. He did not respond. Police sent in the dog, but Valencia did not surrender. He fought the dog.

A large team of SWAT officers stormed in, and Valencia battled them. Valencia pulled one officer down and tried to get his gun. After a struggle, the SWAT team took Valencia into custody. They took him to the hospital for treatment for gas exposure and dog bites.

Lab work found methamphetamine and cocaine in Valencia's blood.

From start to finish, the entire episode lasted some 15 hours:  from about 9 p.m. until past noon the next day.  Despite the considerable duration of the standoff overall, the period between first entry into the apartment and first entry into the bedroom was between 25 minutes and "closer to an hour."

The prosecution charged Valencia with 10 felonies:  the murder of Casillas, four counts of attempted murder, three counts of assault, and one count each of gun possession and reckless flight.  The prosecution's theory was the attempted murder victims were the officers closest to the door and the shooting, while the assault victims were those behind them but still in the line of fire.

The prosecution also alleged each victim of the murder and attempted murders was a peace officer engaged in the performance of duty.  These "performance of duty" allegations are relevant on appeal because Valencia argues the police were not on *lawful* duty because they entered his apartment without a warrant.

A further allegation is pertinent.  With our emphasis, that is the allegation that Valencia murdered Casillas "for the purpose of avoiding and preventing a *lawful* arrest, within the meaning of Penal Code Section 190.2(a)(5)."  Again, Valencia's appellate theory is his arrest was not lawful because officers entered his apartment without a warrant.

Trial began on April 22, 2024 and lasted until May 13, 2024.  After the close of evidence, the court instructed the jury about the charges Valencia faced, including the two types of allegations pertinent to this appeal:  the "lawful duty" allegations and the avoiding "lawful arrest" allegation.

8

The "lawful duty" allegations were as follows. CALCRIM No. 724 explained the allegation charging that the murder of Casillas was of an officer "lawfully performing" his duties. CALCRIM No. 602 set forth the allied allegations that the attempted murder and assault victims were officers "lawfully performing" their official duties.

The second type of allegation concerned "lawful arrest." This "lawful arrest" allegation concerned only the charged murder of Casillas. The court instructed the jury with CALCRIM No. 723, which explained Valencia was charged with the special circumstance of murder committed to prevent arrest in violation of section 190.2(a)(5). To prove this special circumstance was true, the prosecution had to prove that Valencia committed the murder to avoid or prevent a "lawful arrest."

The jury sided with the prosecution in all respects. It rendered the following convictions:

1. Murder of Casillas;

2. Attempted murder of Nyugen;

3. Attempted murder of Officer Samantha Sutcliffe;

4. Attempted murder of Officer Max McNeeley;

5. Attempted murder of Officer Paul Lucifora;

6. Assault with a firearm on Officer Todd Samuels;

7. Assault with a firearm on Officer Christian Pagtakhan;

8. Assault with a firearm on Officer Joe Hernandez;

9. Possession of a gun by a felon; and

10. Felony evasion of a police officer.

We do not refer to these charges by *numbered* counts. The court renumbered counts for the jury, and then renumbered again at sentencing.

9

The court sentenced Valencia on June 10, 2024. The sentence was life in prison without the possibility of parole, plus 278 years to life, plus two years. We return to this sentence at the end of this opinion.

## II

Valencia's appeal raises three issues. On the first point, we hold jurors could find the warrantless police entry was proper. On the second, we reject Valencia's claim that the number of bullets fired must somehow correspond with the proper number of convictions. The prosecution agrees with Valencia on his third argument, which is that aspects of the sentence were erroneous. We remand for correction of technical errors.

### A

Jurors could find the warrantless entry was proper.

Valencia argues that police, to be acting lawfully, needed a warrant. If they were acting *un*lawfully, he contends, this would invalidate both the special circumstances allegations concerning the Casillas murder and the attempted murders, as well as the three counts of assault on peace officers. Police had ample justification for their hot pursuit of a felon, however, and their hot pursuit justified their warrantless entry. Once *inside* Valencia's apartment, law enforcement was not required to seek a warrant to authorize their effort to end the standoff.

#### 1

Our standard of review is deferential as to factual questions. (*People v. Ramirez* (2022) 13 Cal.5th 997, 1117–1118; see also *People v. Jenkins* (2000) 22 Cal.4th 900, 1020 ["Disputed facts relating to the question whether the officer was acting lawfully are for the jury to determine when such an offense is charged"].) We independently review the legal contours of the

constitutional warrant requirement. (See, e.g., *Lange v. California* (2021) 594 U.S. 295, 298–299 (*Lange*).)

The Fourth Amendment to the Constitution protects Americans against unreasonable police searches and seizures in their homes. The touchstone is reasonableness, which generally requires a judicial warrant before police can enter a home without permission. An exception is for exigent circumstances, which arise when the situation makes the needs of law enforcement so compelling that a warrantless search is objectively reasonable. This exception enables police to handle emergencies: situations presenting a compelling need for official action that leave no time to secure a warrant. Officers, for example, may enter a home without a warrant to render emergency assistance to an injured occupant, to protect an occupant from imminent injury, or to ensure their own safety. Police may make a warrantless entry to prevent the imminent destruction of evidence or to prevent a suspect's escape. The delay required to obtain a warrant in those circumstances would have immediate and serious consequences, so courts excuse the absence of a warrant. Courts generally apply the exigent-circumstances exception on a case-by-case basis, which reflects the various nature of emergencies. Whether a now-or-never situation actually exists—in other words, whether an officer has no time to secure a warrant—depends upon facts on the ground. Courts thus look at the totality of circumstances confronting officers as they decide to make warrantless entries. (*Lange, supra,* 594 U.S. at pp. 301–302.)

Hot pursuit can justify warrantless entry, but not always. Pursuit of a fleeing *misdemeanor* suspect does not always—that is, categorically—justify a warrantless entry into a home.

(*Lange, supra,* 594 U.S. at pp. 299, 313.)  "An officer must consider all the circumstances in a pursuit case to determine whether there is a law enforcement emergency.  On many occasions, the officer will have good reason to enter—to prevent imminent harms of violence, destruction of evidence, or escape from the home.  But when the officer has time to get a warrant, he must do so—even though the *misdemeanant* fled." (*Id.* at p. 313, italics added.)

The rules about hot pursuant of *felons* are somewhat uncertain.  Some thought the Supreme Court in *United States v. Santana* (1976) 427 U.S. 38 (*Santana*) had treated the matter on a *per se* basis:  a felon's flight into the home *always* justified warrantless entry by pursuing police.  (See *Lange, supra,* 594 U.S. at pp. 302–305; see *id.* at pp. 315 [concurring opinion of Kavanaugh, J.] & 320 [concurring opinion of Roberts, C.J.].)  But the *Lange* majority opinion merely *assumed* this was so, without reaching the issue.  (*Id.* at pp. 304–305.)

The *Lange* opinion stated that "in a great many cases flight creates a need for police to act swiftly."  (*Lange, supra,* 594 U.S. at p. 307; see also *People v. Escudero* (1979) 23 Cal.3d 800, 810, fn. 6 ["The hot pursuit doctrine is designed to prevent the escape of fleeing felons"]; *People v. Soldoff* (1980) 112 Cal.App.3d 1, 6 ["One recognized rule is known as the 'hot pursuit' doctrine to preclude escape of a suspected felon"].)

Another conventional factor tipping the balance in favor of exigent circumstances is the need to preserve evidence.  (See *Lange, supra,* 594 U.S. at p. 307; *Santana, supra,* 427 U.S. at p. 43 ["Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence"].)

Evidence of intoxicated driving usually exists in a suspect's bloodstream—but merely for a finite interval. Presence of this evidence is incriminating. Its absence is exculpating. As time passes, however, humans metabolize this evidence and thereby destroy it. The failure to test blood promptly means this opportunity to develop evidence of guilt or innocence will be lost.

The high court grappled with the transience of blood evidence in *Mitchell v. Wisconsin* (2019) 588 U.S. 840, 853 (*Mitchell*). The plurality opinion held circumstances are exigent when blood alcohol evidence is dissipating, as it always is, *and a pressing health, safety, or law enforcement need takes priority over a warrant application.* (*Ibid.* (plur. opn. of Alito, J.).) In just a moment, we will apply this rule.

We shift from blood evidence to standoffs. Federal constitutional law guides our analysis of standoffs and warrants. The decision in *Fisher v. City of San Jose* (9th Cir. 2009) 558 F.3d 1069, 1076 (*Fisher*) held that, once police have probable cause for a warrantless arrest, they need not obtain a warrant to cope with a barricaded suspect. *Fisher* is not controlling, but we endorse its sound reasoning.

The facts of the *Fisher* case are germane. Steven Fisher threatened police on a common area near his apartment. (*Fisher, supra,* 558 F.3d. at p. 1072.) More than 60 officers came to the scene in the course of a 12-hour standoff in which Fisher, with many guns, holed up in his apartment. Police finally talked Fisher into surrendering. (*Id.* at p. 1073.)

Fisher sued the police for violating his civil rights, contending their warrantless arrest violated his constitutional rights. The *Fisher* opinion rejected this claim, on the following logic. When Fisher threatened police, he gave them probable

cause for a warrantless arrest. (*Fisher, supra,* 558 F.3d. at p. 1075.) As the standoff progressed, police were not required periodically to reassess whether the exigency persisted throughout the standoff. The many hours of the fluid engagement between Fisher and police represented a single seizure of Fisher. (*Id.* at pp. 1077–1078.)

We adopt and apply the *Fisher* rule in the next section.

2

Jurors could find police did not need a warrant to enter Valencia's apartment. Officers witnessed him commit a felony violation of Vehicle Code section 2800.2 by driving recklessly to evade pursuing police. The prosecution charged Valencia with this felony, and the jury convicted him on this count. Valencia's dangerous and bizarre conduct—wide-eyed laughing at police during an irrational high-speed chase leading nowhere, ending with a crash into a parked car—gave officers grounds for suspecting Valencia's blood would contain evidence of intoxicants. The officers were justified in continuing their pursuit of Valencia through the front door of his apartment in an effort to arrest him before his metabolism eliminated evidence of intoxicated driving.

Under *Mitchell*, the circumstances were exigent because the blood evidence was dissipating, as it always is, *and a pressing safety need took priority over a warrant application.* (*Mitchell, supra*, 588 U.S. at p. 853.) Valencia's conduct had been irrational, unpredictable, confrontational, and hazardous to the public and himself. He had posed a flagrant risk to others, to himself, and to the property of others. Once in his second-floor apartment, would he try to escape via a fire exit, a balcony, or a window? Would he try ropes, sheets, a hanging drop, or a wild leap onto some intermediate surface? Would he harm himself?

Would he take hostages?  Would he hurt people in the apartment?  Would he procure or fashion weapons?  Would he light fires?  How rapidly would the situation evolve?  For every possibility, the answer for the pursuing police was:  who knows?

No limits were apparent.  And shocking surprises indeed were in store.  Valencia was on the move and actively and irrationally dangerous.  Police testified they were "trying to eliminate possibilities and consider the various threats."  Once in the bedroom, Valencia escalated the crisis with his .357 magnum.  The Fourth Amendment's calculus of reasonableness must allow police officers to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.  (*Graham v. Connor* (1989) 490 U.S. 386, 396–397; *City & Cnty. of San Francisco v. Sheehan* (2015) 575 U.S. 600, 612 (*Sheehan*).)

Police had ample reason for immediately apprehending this tornado of chaos.  Bizarre pursuit behavior suggests intoxication, and predicting what dangerous act will follow can be impossible.  (Cf. *People v. Bipialaka* (2019) 34 Cal.App.5th 455, 457 [after using methamphetamine, the defendant ran a red light and deliberately sped at another car without braking because 'I was just going crazy and felt like freaking them out' "].)

Exigent circumstances thus justified police entry through the apartment door.

Once inside, police were not required to interrupt their efforts to seek a warrant.  Officers on the scene must be able to devote their full attention to the threat they face.  The Fourth Amendment did not require them periodically to reassess whether the exigency persisted throughout the standoff.  (*Fisher, supra*, 558 F.3d at p. 1077.)  Exigencies can persist while police pursue time-consuming courses of action.  (*Estate of Bing v. City*

15

*of Whitehall* (6th Cir. 2006) 456 F.3d 555, 566–569; cf. *Sheehan, supra,* 575 U.S. at p. 612 (two entries were part of a single, continuous search or seizure, so the officers were not required to justify the continuing emergency with respect to the second entry).)

Imposing a warrant requirement in this standoff situation would introduce another element of uncertainty into the complex and dangerous calculus the officers confronted. "Police would be forced to ponder with each passing moment whether the exigency justifying the warrantless arrest that existed at the start of the standoff had sufficiently dissipated such that they must immediately divert one or more officers from the task of resolving the standoff to the time-consuming project of obtaining a warrant." (*Fisher, supra*, 558 F.3d at p. 1079.)

The officers thus were *lawfully* performing their duties. Valencia murdered Casillas to avoid or prevent a *lawful* arrest. Overwhelming evidence supported these jury findings. Valencia's challenges to the special circumstances findings and the assault convictions fail.

B

We turn to Valencia's second argument. He fired *six* bullets but was convicted of *eight* crimes based on gun discharges: murder, four counts of attempted murder, and three counts of assault with a gun. Valencia maintains this cannot be. We must reverse two of his *assault* convictions, he claims, because the number of these gun-related convictions cannot exceed the number of bullets he fired.

We emphasize the remedy Valencia seeks pertains only to two of his *assault* convictions. This result would knock the total of the shooting offenses from eight to six. For purposes of this

16

argument, Valencia accepts six as the proper number of convictions. Six was the number of bullets he fired.

To reiterate, the particulars of Valencia's eight shooting convictions are these:

1. Murder of Casillas;
2. Attempted murder of Nyugen;
3. Attempted murder of Officer Sutcliffe;
4. Attempted murder of Officer McNeeley;
5. Attempted murder of Officer Lucifora;
6. Assault with a firearm on Officer Samuels;
7. Assault with a firearm on Officer Pagtakhan; and
8. Assault with a firearm on Officer Hernandez.

Valencia's argument does not address his other two convictions, which were for felony evading and felon in possession of a gun.

Valencia's argument is incorrect. The number of convictions need not equal or be fewer than the number of shots fired. *People v. Raviart* (2001) 93 Cal.App.4th 258, 263–287, for instance, affirmed *two* convictions for assault with a firearm against a defendant who fired *no* shots at all. This result follows from the simple fact that this crime can be complete *without* any fired bullets. Merely pointing a gun can suffice. Indeed, one need not point at the victim. It can be enough that defendants bring a gun into a position where they could have used it against the victim. (*Id.* at p. 266.)

Further to this point, the trial court properly instructed the jury that CALCRIM No. 860 does not list among the elements of assault with a firearm the requirement that the defendant fired a gun. Valencia does not challenge this instruction.

17

These points demolish the argument about relating bullets to convictions. Assault with a firearm does not require *any* shots fired. The law contains no formula linking the number of convictions to the number of flying bullets.

Valencia cites three cases that do not assist him.

*People v. Smith* (2005) 37 Cal.4th 733, 736 *affirmed* two counts of attempted murder against a defendant who had fired one bullet. This holding undercuts Valencia's argument.

*People v. Perez* (2010) 50 Cal.4th 222, 225 held that firing one shot at eight people constituted one offense of attempted murder. The jury also convicted the defendant of eight counts of assault for that one bullet shot. The high court wrote the defendant "could properly be separately punished" for these eight assault convictions. (*Ibid.*) In short, one fired bullet supported eight assault convictions. Valencia cannot use this decision as authority for overturning his assault convictions.

*People v. McCloud* (2012) 211 Cal.App.4th 788, 807 & fn.** refused to allow citation of its analysis of assault counts. This decision is not a basis for overturning Valencia's assault convictions.

Valencia's argument that *the conviction number cannot exceed the shot number* fails.

## C

The parties rightly agree the trial court imposed an erroneous sentence. The sentence must be corrected. Explaining the error requires us to delve into the current intricacies of felony sentencing, which are bewildering to newcomers and can be challenging for even the most experienced and diligent bench officers.

18

Our state has two different sentencing schemes: determinate sentencing and indeterminate sentencing. (*People v. Felix* (2000) 22 Cal.4th 651, 654; cf. Cassou & Taugher, *Determinate Sentencing in California:  The New Numbers Game* (1978) 9 Pac. L.J. 5, 6–22 [recounting historical development]; Zimring, Hawkins, and Kamin, Punishment and Democracy (2001) pp. 3–16, 109–115 [describing and assessing the advent of 1994 Three Strikes Law]; Vitiello *Three Strikes:  Can We Return to Rationality* (1997)  87 J. Crim. L. & Criminology 395, 400–432 [same].)

The jury convicted Valencia of five crimes carrying *determinate* sentences:

1. Assault on Samuels with a firearm in violation of section 245, subdivision (d)(1);

2. Assault on Pagtakhan with a firearm in violation of section 245, subdivision (d)(1);

3. Assault on Hernandez with a firearm in violation of section 245, subdivision (d)(1);

4. Felony evasion in violation of Vehicle Code section 2800.2, and

5. Gun possession in violation of section 29800, subdivision (a)(1).

As to the three assault counts, the jury found true the allegations about firearm use in violation of subdivision (d) of section 12022.53, which results in an enhancement with the *indeterminate* term of 25 years to life.

The trial court ruled it would make these sentences consecutive.

This situation spawned a complexity:  the underlying assault counts carried *determinate* sentences of four, six, or eight

19

years, while their enhancements were subject to the *in*determinate term of 25 years to life. The complexity was how to aggregate these sentences when they were consecutive. The key provision is section 1170.1.

Let us grasp the meaning of this section. We quote the pertinent language in this statutory formula:

"Except as otherwise provided by law, and subject to Section 654, when any person is convicted of two or more felonies, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same or by a different court, and a consecutive term of imprisonment is imposed under Sections 669 and 1170, the aggregate term of imprisonment for all these convictions shall be the sum of *the principal term, the subordinate term, and any additional term imposed for applicable enhancements* for prior convictions, prior prison terms, and Section 12022.1. The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. *The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment* prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed, and shall include one-third of the term imposed for any specific enhancements applicable to those subordinate offenses." (§ 1170.1, subd. (a) italics added.)

To reiterate and summarize, then, with consecutive *determinate* sentences, the "subordinate term" for consecutive offenses "shall consist of one-third of the *middle term* of imprisonment . . . ." (§ 1170.1, subd. (a), italics added.)

The *middle term* varies, depending on the particular crime.

20

For a gun assault on a police officer, the statutory terms are four, six, or eight years. (§ 245, subd. (d)(1).) With this triad, the middle term is six years. One third of six is two.

Under the statutory catchall provision for determinate sentencing, the statutory triad for gun possession and also for felony evading is 16 months, two years, or three years. (See § 29800, subd. (a)(1) [any person who has been convicted of a felony and possesses any firearm "is guilty of a felony"]; Veh. Code, § 2800.2, subd. (a) [if a person flees a pursuing peace officer and drives in disregard for safety, the driver "shall be punished by imprisonment in the state prison"]; § 1170, subd. (h)(1) ["a felony punishable pursuant to this subdivision where the term is not specified in the underlying offense shall be punishable by a term of imprisonment in a county jail for 16 months, or two or three years"].)

One third of a middle term of two years is eight months.

Following section 1170.1, then, the prosecution's sentencing memorandum recommended determinate sentencing for five of Valencia's convictions, as follows:

1. Assault on Samuels: eight years plus 25 years to life. This was the "principal term" under subdivision (a) of section 1170.1.

2. Assault on Pagtakhan: two years (which is one-third of the middle statutory term of six years) plus 25 to life. This was a "subordinate term."

3. Assault on Hernandez: two years (which is one-third of the middle statutory term of six years) plus 25 to life. This also was a "subordinate term."

21

4. Gun possession: eight months (which is one-third of the middle statutory term of two years). This also was a "subordinate term."

5. Evading: eight months (which is one-third of the middle statutory term of two years). This also was a "subordinate term."

In two respects, the trial court departed from the prosecution's sentencing recommendations. First, the court imposed the middle term of six years rather than the high term of eight years for the first assault conviction. No one has challenged this decision. The second departure, however, has created controversy, because *both* parties on appeal say it was error. This second departure concerned whether section 1170.1 governed.

Despite the prosecution's urging that section 1170.1 *did* govern, the trial court stated "the court feels otherwise." Its logic was that imposing indeterminate enhancements to an underlying determinate offense meant section 1170.1 no longer applied: on this view, the indeterminate enhancement made the indeterminate sentencing law the governing authority for the entire sentence on this charge. As a result, the court imposed a consecutive sentence of six years plus 25 years to life for *each* of the three assault counts. That is, the court did not reduce any sentence to one-third of the middle term. The court also imposed a consecutive sentence of two years on the evasion count and stayed a sentence of two years for the gun count. Again, the court did not reduce these sentences to one-third of the middle term.

The court cited no authority for its view that the indeterminate enhancements made section 1170.1 inapplicable.

The rule is to the contrary. It applies when (1) a court imposes consecutive terms for crimes carrying determinate terms, as did the assault counts in this case, and (2) they are accompanied by enhancements carrying indeterminate terms, like Valencia's firearm enhancements in this case under section 12022.53, subdivision (d). Under these circumstances, the principal term and not the enhancement determines whether section 1170.1, subdivision (a), applies. (*People v. Sanders* (2010) 189 Cal.App.4th 543, 558 (*Sanders*).)

The prosecution and the defense agree with this analysis. Both cite *Sanders* as the governing case.

The proper approach thus was to impose one full term plus four terms calculated at one-third the middle term.

The correct sentence with respect to one count of evading an officer and three counts of a gun assault on a peace officer thus is as follows:

1. A middle term of six years on one of the assault counts, plus 25 years to life for the enhancement;

2. A consecutive term of two years (which is one-third of the middle term) for the second assault count, plus 25 years to life for the enhancement;

3. A consecutive term of two years for the third assault count, plus 25 years to life for the enhancement;

4. A consecutive term of eight months for the evasion count, and

5. A stayed term of eight months for the gun count.
(See § 1170.1, subd. (a).)

This correction lowers the aggregate determinate terms for the four offenses from the current 20 years (six times three plus two) to 10 years and eight months (six plus two, plus two, plus

23

eight months).  The technical error on the gun term has no practical effect, because the court stayed that term. Nevertheless, all the errors must be corrected.

## DISPOSITION

We affirm in all respects except that we remand for the trial court to correct the sentence as follows:  reduce the term for the felony evading sentence to eight months, and reduce the determinate terms for two of the assault convictions to two years each.  Although the trial court stayed the sentence for illegal gun possession by a felon, this imposed but stayed sentence likewise must be corrected to eight months, which is one third of the midterm of two years.

WILEY, J.

We concur:

STRATTON, P. J.

SCHERB, J.

24